UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JASON ALAN BROWN,

                    Petitioner,                    Case No. 2:23-cv-199

v.                                            Hon. Hala Y. Jarbou

BARBRA STOREY,

                    Respondent.

_____/

## OPINION

    This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jason Alan Brown is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan. On May 11, 2011, following a jury trial in the Ingham County Circuit Court, Petitioner was convicted of one count of first-degree murder, in violation of Mich. Comp. Laws § 750.316; one count of armed robbery, in violation of Mich. Comp. Laws § 750.529; and one count of conspiracy to commit armed robbery, in violation of Mich. Comp. Laws § 750.157a. The court sentenced Petitioner as a fourth-offense habitual offender, Mich. Comp. Laws § 769.12, to life imprisonment without parole for the murder conviction and concurrent terms of 171 months to 25 years' imprisonment for the armed robbery and conspiracy convictions.

    On October 24, 2023, Petitioner filed his initial habeas corpus petition. (ECF No. 1.) In an order (ECF No. 3) entered on November 8, 2023, the Court directed Petitioner to file an amended petition that clearly set forth all the grounds for relief that he was raising. After receiving an extension of time to do so (ECF Nos. 4, 5), Petitioner filed his amended habeas corpus petition

(ECF No. 6) and a brief in support thereof (ECF No. 7) on January 11, 2024. Petitioner raises the

following 23 grounds for relief in his amended petition:

I.      The court of appeals failed to analyze the legally insufficient evidence and due process claims under federal law and their factual findings were so unsupported that it fell below the threshold of bare rationality.

II.     The court of appeals' decision regarding the Lansing Police Department's exploitation of the unlawful arrest to extract incriminating information resulted in a decision that was contrary to, and involved further unreasonable applications of, clearly established federal law, when they denied the suppression of the fourth interrogation of as the tainted fruit of the earlier illegality.

III.    The decision of the court of appeals on the voluntariness of the petitioner's *Miranda* waiver, including its analyzing under *Seibert*, was based on an unreasonable determination of the facts and is in direct contradiction to several clearly established federal laws.

IV.     The court of appeals' decision on Petitioner's ineffective assistance of counsel claim was based on an unreasonable application of the facts and their failure to remand the matter for an evidentiary hearing deprived the petitioner of an ability to have the record expanded so that a more accurate review could have been made and as such, an accurate decision.

V.      The court of appeals' decision on prosecutorial misconduct misapplies the facts of this case and as such makes an unreasonable determination in light of the evidence that was presented by court documents and as argued by the petitioner in his Standard 4 brief, rendering an inaccurate decision and posing a clear violation of due process.

VI.     The court of appeals' decision regarding the trial court abusing its discretion in allowing a late endorsement of witnesses, by allowing the People to [elicit] suppressed evidence and when it violated Petitioner's due process rights under the inevitable discovery doctrine and misconstrued Petitioner's issue and further was not based on a reasonable application of the facts and is contrary to applicable federal law.

VII.    The court of appeals' decision, again, fails to rule on the backbone of this issue, the trial court's abuse of discretion when it allowed two separate witnesses to offer hearsay testimony, affecting the trial's outcome, and instead misinterpreted Petitioner's clearly titled issue and is based on an unreasonable application of federal law.

VIII.   The trial court erred when it rejected Petitioner's argument that his right to a public trial was violated when it failed to consider an alternative to a

temporary closure and when it failed to realize that the courtroom was never fully opened to the public, being that only the jury pool was allowed to re-enter, requiring habeas relief.

IX.    The trial court erred in its ruling on ineffective assistance of counsel for failing to prepare and for effectively preventing [Petitioner] from testifying.

X.    The trial court's decision on Petitioner's conflict of interest issue lacks alignment with clearly established federal law and lacks specificity with regards to its factual findings.

XI.    The trial court failed to rule on trial counsel's ineffectiveness for failing to object to the initial closure of the courtroom and when he failed to notice that the closure lasted all day.

XII.    Although the trial court ordered a forensic psychological evaluation on the petitioner and his *Miranda* waiver, presumptively agreeing that counsel was ineffective, the trial court never actually made this determination and its decision on the second half, being investigating Stipanuk's mental health, is contrary to federal law and not factually based.

XIII.    The trial court's rejection of Petitioner's *Brady-Giglio* violation error where the People failed to disclose their star witness's benefits for testifying, failing to acknowledge clearly established federal law.

XIV.    The trial court's rejection of the *Brady* argument of the People intentionally withholding the victim's DNA from the Michigan State Police forensics lab is lacking foundation and is again contrary to clearly established federal law.

XV.    The trial court's rejection of the *Brady* argument of the failure of the people to disclose an in-car recording of their star witness, Stipanuk, is based on an unreasonable application of facts as presented and its analysis conflicts with *Brady*.

XVI.    The trial court was correct when it considered the forensic psych evaluation to determine that the [last] interrogation needed to be 'scrubbed' in its entirety as Petitioner did not knowingly and intelligently waive *Miranda* and the court of appeals failed to make an unambiguous or definitive ruling on the second prong of *Miranda* making the trial court's 6/8/20 ruling the last state court decision on the merits.

XVII.    The trial court offered relief on Petitioner's mistrial/manifest necessity issue in his motion for relief from judgment, the court of appeals however failed to make any definitive or specific ruling on this issue and the court of appeals for some reason failed to address the mistrial issue any further than explaining Petitioner's stance, as such, the trial court's ruling on the mistrial is the last state court ruling on this matter.

XVIII.   The court of appeals' decision in regards to the trial court's decision 'jail garb' prior to *Miranda* and how that affected the voluntary prong of *Miranda* fails to offer a complete ruling and only offers explanation of the second half of the trial court's reasoning making it a clearly unreasonable application of the facts of the case and the trial court's decision.

XIX.    The court of appeals' rejection of the trial court's ruling that the People intentionally disposed of the crime scene within 56 hours of Petitioner's arrest and before he was formally arraigned, 'spoliation' for no other reason than the trial court's typographical, clerical error when it referred to the Ingham County Sheriff's Department, instead of the actual agency, the Lansing Police Department, as argued by Petitioner, was in conflict with clearly established federal law and was an unreasonable application of the facts of the case and the argument as made by Petitioner in his motion for relief from judgment.

XX.     Once again, the court of appeals' rejection of Petitioner's ineffective assistance of appellate counsel argument is incomplete, lacks a reasonable application of facts of the case and is in conflict with known federal law and lastly only addresses the three of the four sub-grounds as raised by Petitioner in his motion for relief from judgment.

XXI.    The court of appeals' rejection of counsel's actual innocence claim is based on an unreasonable and faulty application of the facts of the case and wrongly analyzes the trial court's rationale.

XXII.   Counsel appointed to represent [Petitioner] by the trial court for MCR 6.502 proceedings was ineffective when he failed to brief Dr. Wendt's forensic examination report as newly discovered evidence in his supplemental filings to the trial court.

XXIII.  The court of appeals exceeded the scope of their order granting leave to the People, which limited the appeal to issues raised in the application and supplemental brief, when they sua sponte made a determination regarding Dr. Wendt's report not being newly discovered, denying Petitioner a fair appellate process as this issue was not briefed or argued by either side, denying Petitioner of his due process rights.

(Br. Supp. Am. Pet., ECF No. 7, PageID.474–543 (some capitalization and punctuation corrected).) Several of these grounds for relief contain multiple sub-grounds.

Respondent contends that Petitioner's grounds for relief lack merit.[1] (ECF No. 9.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the events underlying Petitioner's convictions as follows:

> This case arises out of the murder and armed robbery of the victim in Lansing, Michigan. [Petitioner] arrived in Lansing and proceeded to spend a significant amount of money purchasing crack cocaine. As a result of this behavior, [Petitioner] needed money. [Petitioner] was aware that the victim had recently cashed a large check because [Petitioner] accompanied the victim to the party store to cash the check. [Petitioner] and his acquaintance, Jason Morse, decided to rob the victim and split the money. While the events surrounding the murder are disputed, [Petitioner] eventually confessed to the police that, according to Morse, [Petitioner] strangled the victim to death.
>
> After the murder, [Petitioner] met with another acquaintance, Christopher Stipanuk, and they continued to use crack cocaine throughout the day. Later that evening, Stipanuk and [Petitioner] planned to meet Morse in an alley to exchange a car, so [Petitioner] pulled into the alley to await Morse's arrival. While waiting, [Petitioner] began to pound the steering wheel and behave erratically. [Petitioner] then admitted to Stipanuk that he and Morse intended to rob the victim, split the money, and the victim ended up dead.

---

[1] Respondent also contends that some of Petitioner's grounds for relief are unexhausted and procedurally defaulted. (ECF No. 9.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix, 520 U.S. at 525; Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

> While [Petitioner] and Stipanuk were waiting in the alley, the police received a report of a suspicious vehicle. The police approached [Petitioner's] car and Stipanuk immediately informed the police that he had a warrant out for his arrest. Stipanuk then relayed [Petitioner's] admission to the police. While one officer was talking with Stipanuk, another officer noticed drug paraphernalia in the car, and conducted a search of the vehicle. The officer questioned [Petitioner] about his drug use but when he was informed of Stipanuk's statements, the officer placed [Petitioner] in the back of the patrol car.
>
> [Petitioner] was then transported to the police precinct. An interrogating officer questioned [Petitioner] three times regarding the murder, giving [Petitioner] his *Miranda* warnings[] only before [Petitioner's] last statement. [Petitioner] was eventually charged with open murder, armed robbery, and conspiracy to commit armed robbery. After a jury trial, [Petitioner] was convicted of first-degree murder, MCL 750.316, armed robbery, MCL 750.529, and conspiracy to commit armed robbery, MCL 750.157a. [Petitioner] was sentenced to life imprisonment for first-degree murder and 171 months to 25 years for armed robbery and conspiracy to commit armed robbery.

*People v. Brown*, No. 305153, 2012 WL 3536982, at *1 (Mich. Ct. App. Aug. 16, 2012) (footnote omitted).

Jury selection for Petitioner's trial occurred on April 11, 2011. (Trial Tr. I, ECF No. 10-7.) Over the course of the next two days, the jury heard testimony from numerous witnesses, including Stipanuk and law enforcement officers. (Trial Tr. II & III, ECF Nos. 10-8 and 10-9.) On April 15, 2011, after approximately 4 hours of deliberation, the jury returned a guilty verdict. (Trial Tr. IV, ECF No. 10-10, PageID.1290.) Petitioner appeared before the trial court for sentencing on May 11, 2011.

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals. In a counseled brief, Petitioner raised the following claims: (1) his convictions were obtained on the basis of legally insufficient evidence; (2) the trial court erred by not suppressing Petitioner's confession as the "tainted fruit" of officers' detention of Petitioner without probable cause; and (3) Petitioner's statement to police and waiver of his *Miranda* rights were involuntary, and the admission of his confession violated his Fifth Amendment right against

self-incrimination. (ECF No. 11-2, PageID.2136.) In a *pro per* supplemental brief, Petitioner raised the following additional claims: (1) trial counsel rendered ineffective assistance; (2) the prosecution committed misconduct; and (3) the trial court abused its discretion by allowing the admission of evidence and allowing the prosecution to amend its witness list less than 30 days before trial. (*Id.*, PageID.2197.) The court of appeals subsequently granted Petitioner's motion to file additional issues in support of his *pro per* supplemental brief. (*Id.*, PageID.1962.) On August 16, 2012, the Michigan Court of Appeals rejected Petitioner's arguments and affirmed his convictions and sentences. *Brown*, 2012 WL 3536982, at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on January 25, 2013. *See People v. Brown*, 825 N.W.2d 69 (Mich. 2013). The United States Supreme Court denied Petitioner's petition for a writ of certiorari on October 7, 2013. *See Brown v. Michigan*, 571 U.S. 865 (2013).

On August 5, 2014, Petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, asserting numerous claims for relief. (ECF No. 13.) The motion remained pending before the trial court for seven years. The trial court held a hearing on the motion on December 10, 2020. (ECF No. 10-19.) In an opinion and order entered on June 8, 2021, the trial court granted Petitioner's motion on several grounds, notably: "[t]he extracting of incriminating statements after ineffective *Miranda* warnings; the jury viewing video of interrogation with [Petitioner] in a jail uniform; the use of suppressed evidence at trial by the prosecutor; trial counsel's decision to not pursue a mistrial; the failure to [present] expert testimony of [Petitioner's] mental state during interrogation; and withholding knowledge of spoliation." *See People v. Brown*, No. 10-631-FC, 2021 WL 10564394, at *14 (Ingham Cnty. Cir. Ct. June 8, 2021). The trial court concluded that "a reasonable juror would have voted for acquittal had the errors not occurred." *Id.*

The trial court subsequently denied the State's motion for reconsideration. *See People v. Brown*, No. 10-631-FC, 2021 WL 10564390, at *1 (Ingham Cnty. Cir. Ct. Aug. 19, 2021).

The State sought leave to appeal to the Michigan Court of Appeals, which was granted. On appeal, the State argued that the "trial court relied on nonexistent facts, improperly assessed the evidence and legal standards, and abused its discretion by granting the motion." *People v. Brown*, No. 358352, 2023 WL 2051898, at *1 (Mich. Ct. App. Feb. 16, 2023). The court of appeals agreed with the State and reversed and remanded for "entry of an order denying the motion for relief from judgment." *Id.* The Michigan Supreme Court denied Petitioner's application for leave to appeal on August 22, 2023. *See People v. Brown*, 993 N.W.2d 833 (Mich. 2023). The instant § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard

is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180. "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits." *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Ground I—Sufficiency of the Evidence

As his first ground for relief, Petitioner contends that the evidence presented was insufficient to sustain his convictions. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.474.) Petitioner faults the Michigan Court of Appeals for failing to analyze his sufficiency claim "under [f]ederal law" and contends that the court's "factual findings were so unsupported that [they] fell below the threshold of bare rationality." (*Id.*)

Petitioner raised his sufficiency claim on direct appeal, and the court of appeals rejected it, first applying the following standard for reviewing Petitioner's claim:

> "Due process requires that a prosecutor introduce evidence sufficient to justify a trier of fact to conclude that the defendant is guilty beyond a reasonable doubt." *People v. Tombs,* 260 Mich. App. 201, 206–207; 679 N.W.2d 77 (2003). "We review de novo a challenge on appeal to the sufficiency of the evidence." *People v. Ericksen,* 288 Mich. App. 192, 195; 793 N.W.2d 120 (2010). We review the evidence in a light most favorable to the prosecution to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v. Tennyson,* 487 Mich. 730, 735; 790 N.W.2d 354 (2010) (internal quotations and citations omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v. Unger,* 278 Mich. App. 210, 222; 749 N.W.2d 272 (2008).

*Brown*, 2012 WL 3536982, at *1. Although the court of appeals cited state authority, the standard applied is identical to the constitutional "sufficiency of the evidence" standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires the court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the determination of regarding Petitioner's sufficiency of the evidence challenge is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness

credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

After setting out the standard of review, the court of appeals followed *Jackson*'s command. The court of appeals rejected Petitioner's various sufficiency arguments, stating:

> [Petitioner] challenges that there was insufficient evidence to convict him of armed robbery and conspiracy to commit armed robbery without the evidence of his statements, and his statements were inadmissible pursuant to the corpus delicti doctrine. However, [Petitioner's] statements were admitted at trial and the jury properly relied upon them. Thus, rather than a sufficiency challenge, an objection based on the corpus delicti doctrine is a challenge to the admissibility of the evidence. *People v. Harden*, 474 Mich. 862, 862; 703 N.W.2d 189 (2005).
>
> Even construing this as a challenge to the admissibility of the statements, [Petitioner] is still not entitled to relief. This Court reviews a challenge based on the corpus delicti doctrine for an abuse of discretion. *People v. King*, 271 Mich. App. 235, 239; 721 N.W.2d 271 (2006). "In a criminal prosecution, proof of the *corpus delicti* of a crime is required before the prosecution may introduce a defendant's inculpatory statements." *People v. Schumacher*, 276 Mich. App. 165, 180; 740 N.W.2d 534 (2007) (emphasis in original). "[T]he rule provides that a defendant's confession may not be admitted unless there is direct or circumstantial evidence independent of the confession establishing (1) the occurrence of the specific injury (for example, death in cases of homicide) and (2) some criminal agency as the source of the injury." *People v. Konrad*, 449 Mich. 263, 269–270;

13

536 N.W.2d 517 (1995). The threshold showing is a preponderance of the evidence. *People v. Burns*, 250 Mich. App. 436, 438; 647 N.W.2d 515 (2002).

[Petitioner's] inculpatory statements were properly admitted pursuant to corpus delicti rule because direct and circumstantial evidence supported a finding that an armed robbery and conspiracy to commit armed robbery occurred. [Petitioner] accompanied the victim to a party store to cash the victim's large check. The victim had $9,600 as a result of this transaction. Soon after, the victim was found strangled in his apartment with only $600 in his wallet. Morse was found with $1,087 and an air pistol in his car, which suggests that a second individual was involved. While certainly circumstantial, this evidence supports a finding that the victim was robbed and that the criminal agency of two individuals was the source of the injury. See *Konrad*, 449 Mich. at 269–270. While [Petitioner's] confession may have elevated the charges to armed robbery or conspiracy, "a defendant's confession . . . may be used to elevate the crime to one of a higher degree or to establish aggravating circumstances." *People v. Cotton*, 191 Mich. App. 377, 389; 478 N.W.2d 681 (1991).

[Petitioner] also argues that there was insufficient evidence to support his armed robbery conviction because the larceny in this case was incomplete. This argument is moot. [Petitioner] candidly admits that he presents this issue hoping that the Michigan Supreme Court would reverse this Court's decision in *People v. Williams*, 288 Mich. App 67, 75; 792 N.W.2d 384 (2010). The Michigan Supreme Court, however, affirmed this Court's opinion, recognizing that "an attempted robbery or attempted armed robbery with an incomplete larceny is now sufficient to sustain a conviction under the robbery or armed robbery statutes, respectively." *People v. Williams*, 491 Mich. 164, 172; 814 N.W.2d 270 (2012).

[Petitioner] also asserts that there was insufficient evidence to support his first-degree murder conviction because the prosecution failed to demonstrate premeditation and deliberation. As [Petitioner] notes, it is unclear whether the jury found defendant guilty of first-degree murder based on premeditation and deliberation or based on felony-murder. Nevertheless, [Petitioner] does not dispute that the elements of felony-murder were established or that felony-murder does not require evidence of premeditation and deliberation. *See People v. Seals*, 285 Mich. App. 1, 12; 776 N.W.2d 314 (2009). [Petitioner] also fails to cite any authority for the proposition that the prosecution had to prove the elements of first-degree premeditated murder when it has already proven the elements of felony-murder. In fact, [Petitioner's] argument contravenes the plain meaning of MCL 750.316, which specifically allows the prosecution to prove felony-murder without a showing of premeditation or deliberation. Thus, [Petitioner's] conviction for first-degree murder does not require reversal.

Lastly, in [Petitioner's] Standard 4 brief, he raises a challenge to the sufficiency of the evidence for conspiracy to commit armed robbery. "Conspiracy is a specific-intent crime, because it requires both the intent to combine with others and the intent to accomplish the illegal objective." *People v. Mass*, 464 Mich. 615, 629;

628 N.W.2d 540 (2001). According to Stipanuk, [Petitioner] admitted that he and Morse intended to "hit a lick"[2] and agreed to split the victim's money. This demonstrates [Petitioner's] intent to combine actions with Morse and intent to rob the victim. See *Mass*, 464 Mich. at 629. Further, since conflicts of the evidence are resolved in favor of the prosecution, *Unger*, 278 Mich. App at 222, [Petitioner's] argument that other evidence suggested a lack of concert action is meritless. While [Petitioner] also challenges that it was a one-man conspiracy since Morse was not convicted of conspiracy to commit armed robbery, the one-man[] conspiracy rule "does not apply where alleged co-conspirators are separately tried . . . ." *People v. Anderson*, 418 Mich. 31, 38; 340 N.W.2d 634 (1983).

_____

[2] Stipanuk testified that "hit a lick" means to rob someone.

*Brown*, 2012 WL 3536982, at *2–3 & n.2 (sub-headings omitted).

*Jackson* holds that it is the factfinder's province to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id*. at 655. The *Coleman* Court described a reasonable inference as an inference that a rational factfinder could make from the facts. *See id.* at 654–55. The inferences need not be compelled by those facts; the inferences may not even be more likely than not; they are simply rational. *Id*. at 656. Nothing more is required.

In his amended § 2254 petition, Petitioner now challenges the court of appeals' conclusion regarding his armed robbery and conspiracy to commit armed robbery convictions. Petitioner first faults the court of appeals for "cherry-pick[ing] facts of the case" to establish that a robbery took place. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.474.) Petitioner avers that the court of appeals' reference to how much money Morse was found in possession of "completely lacks any semblance of reality or truth as there was a 10 day time span between the decedent cashing the check and the alleged robbery." (*Id.*) Petitioner argues that the court of appeals failed to consider "that the decedent had bank accounts, safe despite box(es), or someone holding his cash for him,

or that it was hidden in the apartment." (*Id.*) Petitioner also notes that the CSI team testified "that nothing in the apartment indicated that a robbery had occurred and they were not allowed to do a comprehensive search of the scene." (*Id.*) Petitioner also faults the court of appeals for relying upon out-of-court statements made by Stipanuk, especially in light of his testimony that Petitioner "never told him they robbed anyone, never told him they killed anyone[,] and never told them that anyone even got hurt." (*Id.*, PageID.475.) Petitioner also notes that jailhouse snitch Cervantes testified that Petitioner told him that Petitioner acted alone and that no robbery occurred. (*Id.*)

Petitioner's suggestion that the decedent could have stashed money elsewhere is solely based upon Petitioner's speculation. Certainly, in light of the time span between when the check was cashed and the incident, it is possible that one could interpret the lack of funds found in the decedent's wallet and the amount of money found in Morse's possession differently. However, that does not render the court of appeals' inferences irrational.

With respect to Stipanuk's testimony, Petitioner is correct that on cross-examination, Stipanuk testified that Petitioner never told him that he had killed anyone and never said anybody had been hurt. (Trial Tr. II, ECF No. 10-8, PageID.1168.) However, right after that testimony, Stipanuk testified that Petitioner told him that "he couldn't believe that he was dead," referring to the decedent. (*Id.*) Moreover, during direct examination, Cervantes testified that while in jail with Petitioner, Petitioner had mentioned having a co-defendant to Cervantes. (Trial Tr. III, ECF No. 10-9, PageID.1231.).

With respect to the court of appeals' conclusion regarding the conspiracy conviction, Petitioner contends that the only testimony "that could be used for any conspiracy charge" was the testimony given by Stipanuk. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.475.) According to Petitioner, Stipanuk testified only that the "[c]o-defendant wanted to rob the decedent and the

petitioner told the [c]o-defendant that they weren't just going to go rob him, that if they were going to rob him, they were going to plan it." (*Id.*) Petitioner suggests that according to Stipanuk, "the petitioner never mentions knowledge of a gun or the use of a gun, or any other weapon to him." (*Id.*, PageID.475–476.) Petitioner notes that even if his confession elevated the charges to armed robbery and conspiracy, he "never acknowledged an awareness of a gun or any other weapon to be used prior to or during the 'planning' of any crime." (*Id.*, PageID.476.)

Contrary to Petitioner's assertion, during trial, Stipanuk explicitly testified that when Petitioner confessed to him, Petitioner "said that they were in the living room and Jason Morse had a gun, and then he said that's what it just happened." (Trial Tr. II, ECF No. 10-8, PageID.1160.) Moreover, on cross-examination, Stipanuk noted that Petitioner told him that Morse was waiving a gun around when they were in the victim's apartment. (*Id.*, PageID.1169-1170.)

In light of the testimony given by Stipanuk and Cervantes, there was sufficient evidence for the jury to convict Petitioner of both armed robbery and conspiracy to commit armed robbery. Petitioner has not demonstrated that the court of appeals' inferences are irrational. Moreover, Petitioner's arguments appear to challenge the credibility of the prosecution's witnesses—particularly Stipanuk and Cervantes. Petitioner, therefore, essentially invites this Court to reweigh the credibility of these witnesses and resolve all conflicts and make all inferences in his favor. However, it is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are rational. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the jury's verdicts is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground I.

B.    **Ground II—Unlawful Arrest**

As his second ground for relief, Petitioner contends that the court of appeals' conclusion that Petitioner was not unlawfully arrested and, therefore, that his statements should not have been suppressed as fruit of the poisonous tree was contrary to, or an unreasonable application of, clearly established federal law." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.476.) On appeal, the court of appeals noted:

> [Petitioner] first argues that his third statement was the result of an illegal arrest and, thus, it was fruit of the poisonous tree and should have been excluded. [Petitioner] suggests that this illegal arrest began when he was placed in the back of the patrol car, which was after the *Terry* stop[3] and was without proper justification. Even assuming arguendo that [Petitioner] was illegally arrested, his claim still fails.
>
> When police officers initially approached [Petitioner] in the alley, it was because they received a report of a suspicious vehicle and they suspected drug activity. After being approached by the officers, Stipanuk informed the police that he had [a] warrant out for his arrest and that [Petitioner] had just admitted to being involved in a homicide. The police placed [Petitioner] in the back of a patrol car, which [Petitioner] argues was "*after* the *Terry* stop" and occurred without sufficient justification.
>
> However, even if this constituted an illegal arrest, "[t]he mere fact of an illegal arrest does not per se require the suppression of a subsequent confession." *People v. Kelly*, 231 Mich. App. 627, 634; 588 N.W.2d 480 (1998) (internal quotations and citation omitted). "Intervening circumstances can break the causal chain between the unlawful arrest and inculpatory statements, rendering the confession sufficiently an act of free will to purge the primary taint of the unlawful arrest." *Id.* (internal quotations and citation omitted). Other factors that may be relevant are the time lapse between the arrest and the statement, the flagrancy of the police's misconduct, and antecedent circumstances. *People v. Coomer*, 245 Mich. App. 206, 222; 627 N.W.2d 612 (2001).
>
> In this case, after [Petitioner] was placed in the patrol car and transported to the precinct, the police interviewed other witnesses, conducted a search of the victim's apartment, and discovered the victim's deceased body. Thus, the police confirmed that a murder had occurred and this "new evidence with which defendant was confronted before he made the inculpatory statement was a sufficient intervening circumstance to sever any causal connection between defendant's arrest and his subsequent confession." *Kelly*, 231 Mich. App. at 636–637; *see also Brown v. Illinois*, 422 U.S. 590, 603; 95 S. Ct. 2254; 45 L. Ed. 2d 416 (1975) (stating that the presence of intervening circumstances is a relevant consideration in determining

the admissibility of a confession after an illegal arrest). Further, more than seven hours passed from [Petitioner's] initial detention to when he gave the third statement to the police. Thus, because intervening circumstances and the significant time lapse severed any causal relationship with the alleged illegal arrest, there was no error in admitting [Petitioner's] statement at trial. *See Coomer*, 245 Mich. App. at 222.

---

[3] *Terry v. Ohio*, 392 U.S. 1; 88 S. Ct. 1868; 20 L. Ed. 2d 889 (1968).

*Brown*, 2012 WL 3536982, at *4.

Typically, Fourth Amendment search and seizure issues are not cognizable on habeas review under *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.*; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

For the *Stone* doctrine to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

It is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Indeed, the record reflects that Petitioner took advantage of that mechanism by filing various motions to suppress. Petitioner also has not alleged any facts showing that the State's mechanism had broken down—

and he cannot. Petitioner filed his motions to suppress, one of which was partially granted by the trial court and one of which was denied. Petitioner challenged these denials not only on direct appeal, but indirectly during Rule 6.502 proceedings. As set forth above, the court of appeals concluded that even if Petitioner had been unlawfully arrested, that did not automatically lead to the conclusion that his statements should be suppressed as fruit of the poisonous tree.

Therefore, without something more, *Stone* bars this Court's consideration of the merits of Petitioner's argument that he was unlawfully arrested and that his statements were, therefore, fruit of the poisonous tree. *See, e.g.*, *Cardwell v. Taylor*, 461 U.S. 571, 572–73 (1983) (*Stone* bars habeas review of a claim that custodial statements were obtained in violation of the Fourth Amendment); *Prowell v. Overton*, No. 93-1949, 1994 WL 146842, at *1 (6th Cir. Apr. 22, 1994) ("Prowell's first claim, that the trial court failed to suppress a statement made following an unlawful arrest, is not subject to federal habeas review because Prowell has had a full and fair opportunity in the state courts to litigate his claim of an unlawful arrest."); *Lamb v. Palmer*, No. 03-73587, 2010 WL 733014, at *3 (E.D. Mich. Mar. 1, 2010) (concluding same); *Ingram v. Stovall*, No. 2:06-cv-14955, 2008 WL 2605078, at *6–7 (E.D. Mich. June 30, 2008) (concluding same). Here, Petitioner offers "nothing more" that would allow this Court to consider the merits of his Fourth Amendment argument. Although Petitioner contends that his statements were made involuntarily and in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), those arguments are properly considered pursuant to the Fifth Amendment and will be discussed below.

For the foregoing reasons, Petitioner has failed to demonstrate either prong of *Stone v. Powell*, and he has failed to assert "something more" that would permit this Court to consider the merits of his Fourth Amendment argument. Accordingly, Petitioner's Fourth Amendment claim is barred on federal habeas review, and he is not entitled to relief with respect to habeas ground II

### C.    Grounds Implicating Petitioner's *Miranda* Rights

Petitioner raises several grounds for relief that implicate his rights under *Miranda*. Before considering each ground, the Court provides a detailed summary of the relevant procedural background below.

### 1.    Relevant Background

On October 26, 2010, the trial court began to conduct a *Walker* hearing[2] regarding Petitioner's challenge to the admissibility of his confession. (ECF No. 10-4.) During that hearing, the trial court heard testimony from Lansing Police Department Officers Nathan Osborn and James Gill. (*Id.*)

Officer Osborn testified that on April 19, 2010, he was dispatched to investigate a call regarding suspicious activity in an alleyway. (*Id.*, PageID.1048.) When Officer Osborn arrived, he made contact with two subjects in a vehicle, Petitioner and Chris Stipanuk. (*Id.*) Officer Osborn testified that Petitioner appeared to be under the influence of crack or another stimulant because he was "very fidgety." (*Id.*) Petitioner exited the vehicle at Officer Osborn's request, and Officer Osborn searched the vehicle. (*Id.*, PageID.1049.)

Officer Osborn testified that he and Petitioner were both standing at the tailgate of the vehicle when Officer Doezema "put out some radio traffic referenc[ing] a possible homicide suspect." (*Id.*) Petitioner "made the statement that that's Jason Morse and he's got drugs and possibly a gun on him." (*Id.*, PageID.1050.) At some point, Officer Doezema came up and said that Petitioner needed to be secured in the patrol car. (*Id.*) Once Petitioner was in the patrol car, he

---

[2] *People v. Walker*, 132 N.W.2d 87 (Mich. 1965), requires the trial court to conduct an evidentiary hearing when a defendant challenges the admissibility of a confession.

and Officer Osborn continued to talk about Petitioner's drug use and his activities over the past five days. (*Id.*)

Petitioner was subsequently transported to the north precinct, and Officer Osborn told Petitioner that they were going to talk to a detective. (*Id.*, PageID.1051.) Petitioner was placed in one of the interview rooms upon arrival at the precinct. (*Id.*) Officer Osborn testified that Petitioner was still displaying signs of being under the influence of crack cocaine. (*Id.*) He noted that after he placed Petitioner in the interview room, he was "in and out of the room," and there were times that he left Petitioner in the room by himself. (*Id.*)

Eventually, Detective Gill came to talk to Petitioner. (*Id.*, PageID.1052.) Officer Osborn testified when Detective Gill came to talk to Petitioner, Petitioner had neither been told that he was under arrest nor that he was free to leave. (*Id.*) Officer Osborn observed Detective Gill's interview of Petitioner. (*Id.*) Officer Osborn testified that while he observed the interview, it appeared to him that Petitioner's demeanor "had changed somewhat." (*Id.*) Specifically, Officer Osborn testified that Petitioner was "more calm" than when Officer Osborn had first encountered him. (*Id.*)

On cross-examination, Officer Osborn testified that there came a point where Petitioner was not free to leave after Officer Osborn's initial contact with him at the vehicle. (*Id.*) When Officer Osborn took Petitioner to the station, Petitioner's cell phone and day planner were taken and logged into evidence. (*Id.*) Officer Osborn testified further on cross that the door to the interview room was locked from the outside, so Petitioner was unable to leave. (*Id.*, PageID.1053.)

After redirect examination, the trial judge asked Officer Osborn why he did not read Petitioner his *Miranda* rights. (*Id.*, PageID.1054.) Officer Osborn responded; "I wasn't questioning him on, I guess, the—I know that there was a possible homicide but I didn't question him [regarding] the homicide." (*Id.*) Officer Osborn confirmed that Petitioner was not free to go. (*Id.*)

He clarified that he reads a suspect the *Miranda* rights when the suspect is going to be questioned. (*Id.*) When asked, Officer Osborn testified that even though Petitioner appeared to be under the influence of crack cocaine, Petitioner knew where he was and was oriented as to date, time, and place. (*Id.*)

After the trial court questioned Officer Osborn, the prosecution and defense had some follow-up questions. On redirect, Officer Osborn testified that he had no intentions of questioning Petitioner regarding the homicide that Officer Doezema had mentioned over the radio. (*Id.*, PageID.1055.) On recross, Officer Osborn testified that although he had received information that Petitioner had potentially been involved in a homicide, he did not *Mirandize* Petitioner because he did not intend to question Petitioner about the homicide. (*Id.*)

The prosecution then called Detective Gill as a witness. Detective Gill testified that Petitioner was placed in the interview room around 9:05 p.m. (*Id.*, PageID.1056.) His questioning of Petitioner was recorded by video. (*Id.*, PageID.1057.) Detective Gill testified that he started the recording and that it ran continuously until he ended it at 4:07 a.m. (*Id.*) Petitioner was not handcuffed at the time of the interview. (*Id.*)

Detective Gill testified that when he started the interview, Petitioner "appeared to be on something. He was acting nervous, he couldn't sit still, so he appeared to be on something." (*Id.*, PageID.1058.) However, Petitioner answered Detective Gill's questions "appropriately" and in a manner that made sense. (*Id.*) Detective Gill testified that Petitioner was "very coherent" despite speaking "very softly [and] low." (*Id.*) Petitioner did not have trouble understanding Detective Gill's questions. (*Id.*)

During the interview, Petitioner told Detective Gill that he was in town "to do a roofing job," and that he had run into Jason Morse and the victim. (*Id.*) Petitioner indicated that "they just

partied over the weekend, got high, used drugs." (*Id.*) Petitioner indicated that the victim had received "a large sum of money." (*Id.*) Petitioner also stated that he believed he had killed the victim. (*Id.*) Detective Gill then elicited details regarding that statement from Petitioner because he was hoping that Petitioner would tell him where the body was located. (*Id.*) Petitioner responded with an address, and Detective Gill left the interview room to ask an officer to go to the address and check to see if there was a body there. (*Id.*, PageID.1059.) When the officer discovered a body, that information was relayed to Detective Gill. (*Id.*)

Afterwards, Detective Gill "continued to interview the other witnesses to try to find out more information about what had happened down there." (*Id.*) He then returned to Petitioner's interview room with the CSI team. (*Id.*) The CSI team took swabs and took Petitioner's clothing as evidence. (*Id.*) Detective Gill read Petitioner his rights, Petitioner waived them, and Detective Gill continued to interview him. (*Id.*)

Detective Gill testified that his first interview of Petitioner lasted about "40 something minutes, 43, 47 minutes." (*Id.*, PageID.1060.) During that interview, Petitioner gave several versions on how the victim died. (*Id.*) At that point, Detective Gill had not told Petitioner that he was under arrest, and he did not indicate that Petitioner could not leave. (*Id.*)

Detective Gill testified that Petitioner appeared to be in physical pain during the interview. (*Id.*, PageID.1061.) Detective Gill referenced Petitioner's right foot or right ankle, "some type of injury prior to him coming to Lansing." (*Id.*) At no time did Petitioner indicate that he needed medical attention. (*Id.*) Detective Gill stated that Petitioner's injury did not appear to affect their conversation. (*Id.*)

Detective Gill testified that Petitioner verbally consented to the CSI team taking swabs from under his fingernails. (*Id.*, PageID.1061.) After the swabbing, Detective Gill started another

interview of Petitioner. (*Id.*) By that time, over 5 hours and 20 minutes had elapsed. (*Id.*) Petitioner was sleeping in the interview room during most of that time. (*Id.*) According to Detective Gill, he went back to interview Petitioner again around 3:28 a.m., and he brought the advice of rights. (*Id.*) Petitioner signed and initialed each right to indicate his understanding. (*Id.*, PageID.1062.) Detective Gill read each right to Petitioner and also put the form right in front of Petitioner. (*Id.*) At no time did Petitioner state that he could not read the document. (*Id.*) Detective Gill read each right to Petitioner. (*Id.*)

After Petitioner signed the advice of rights, Detective Gill interviewed him for "about 33, 35 minutes." (*Id.*, PageID.1063.) During that interview, Petitioner's demeanor was "fine," and he did not appear to be intoxicated anymore. (*Id.*) Detective Gill testified that Petitioner was "sitting upright and he's talking. He's not fidgety any more." (*Id.*) Detective Gill believed that by the time of that interview, "whatever high [Petitioner] was under had passed." (*Id.*) At no time did Petitioner indicate that he did not want to talk. (*Id.*) Detective Gill testified that he had no intention of letting Petitioner go when he first spoke to Petitioner because of the need to verify "whether or not there was a body there on the south end." (*Id.*)

The trial court continued the *Walker* hearing on November 23, 2010. (ECF No. 27-1.) During cross-examination, Officer Gill admitted that when he first went into the interview room and started speaking with Petitioner, he had not read Petitioner his *Miranda* rights. (*Id.*, PageID.5651.) Officer Gill clarified that he went in and out of the interview room several times before reading Petitioner his *Miranda* rights, and that he read the rights during the last time he went into the interview room and after learning that a body had been found in the apartment at the address given by Petitioner. (*Id.*, PageID.5652.) Officer Gill testified that he "knew when [he] found out about the body, [he] was going to have to *Mirandize* [Petitioner]." (*Id.*)

25

The trial court issued an opinion and order regarding Petitioner's motion to suppress statements on January 7, 2011. (ECF No. 27-2.) The court concluded that Petitioner was in custody when he was questioned by police, and that officers "failed to inform [Petitioner] of his *Miranda* rights until he was to begin questioning [Petitioner] for the third time." (*Id.*, PageID.5668.) The court granted the motion to suppress with respect to video of Petitioner's first and second interrogations, as well as parts of the third interrogation that relied upon "information obtained during the first two interrogations." (*Id.*) The court also suppressed "3:55:42 to 3:57:33" from the video after concluding that "the probative value of these statements is substantially outweighed by the danger of unfair prejudice." (*Id.*) The court denied the motion in all other respects.

Subsequently, on March 16, 2011, the trial court conducted a hearing regarding Petitioner's motion to suppress evidence. (ECF No. 27-3.) Petitioner, through counsel, argued that "the facts clearly indicate that this was an illegal arrest from the point Officer Doezema took [Petitioner] into custody at the scene." (*Id.*, PageID.5671.) Counsel argued that any evidence obtained from that illegal arrest—notably, Petitioner's third statement made to law enforcement—should be suppressed. (*Id.*) In support of that argument, counsel for Petitioner argued that the statement was made "seven and a half hours after the illegal arrest." (*Id.*, PageID.5672.) Counsel for Petitioner also argued that there were "no intervening circumstances" to warrant admission of the statement. (*Id.*) Counsel argued further that the victim's body "should be suppressed as a fruit of the poisonous tree because the only way they found it is by my client's now-suppressed statement as to the apartment where Eric lived." (*Id.*) Counsel averred that the "time lapse between the illegal arrest definitely does not weigh in the prosecution's favor. I think there was f[l]agrant misconduct by the officers in what they did." (*Id.*)

In response, the prosecution argued that the confession could be admitted under the independent source doctrine. (*Id.*, PageID.5673.) Specifically, the prosecution argued that Mr. Stipanuk was the independent source because Petitioner had confessed to committing the homicide to Mr. Stipanuk. (*Id.*) The prosecution argued further that under the inevitable discovery doctrine, the victim's body would have been found even without Petitioner's confession. (*Id.*) Ultimately, the trial court denied Petitioner's motion to suppress based upon "both the independent source doctrine and the inevitable doctrine, discovery doctrine basis." (*Id.*, PageID.5675.)

On direct appeal, Petitioner raised "four challenges to the trial court's decision to admit [his] last statement." *Brown*, 2012 WL 3536982, at *3. Petitioner first argued that the third statement resulted from his illegal arrest and, therefore, should have been excluded as fruit of the poisonous tree. *Id.* at *4. The court of appeals concluded that Petitioner's claim failed "[e]ven assuming arguendo that [he] was illegally arrested." *Id.* The court of appeals based that conclusion on its finding that "intervening circumstances and the significant time lapse [of more than seven hours] severed any causal relationship with the alleged illegal arrest." *Id.*

Next, Petitioner argued that his confession and waiver of *Miranda* rights were involuntary because they resulted from "police coercion, sleep deprivation, drug use, and a preexisting physical injury." *Id.* The court of appeals disagreed. *Id.* The court noted that Petitioner did not require medical attention and that his leg injury "did not affect his ability to converse in a responsive manner." *Id.* The court of appeals noted further that there was no indication that Petitioner's "alleged drug use interfered with his ability to assert his free will." *Id.* at *6. Notably, Petitioner "was responsive to the officer's questions and gave no indication that he failed to comprehend what was happening or what was being asked of him." *Id.* Moreover, Petitioner was "able to sleep for approximately an hour before giving the third statement to police." *Id.*

Third, Petitioner argued that because his first two statements were obtained in violation of *Miranda*, "his last statement was impermissibly tainted even though he waived his *Miranda* rights before giving the statement." *Id.* The court of appeals disagreed, noting that more than four hours passed between Petitioner's first statements and his *Mirandized* statement, and that a reasonable person would have viewed the third questioning session "as a new and distinct experience." *Id.* (quoting *People v. Steele*, 292 Mich. App. 308, 320; 806 N.W.2d 753 (2011)). The court of appeals noted that Petitioner's *Mirandized* statement also "varied significantly from his initial statements." *Id.* at *7.

Finally, Petitioner argued in his *pro per* supplemental brief that evidence of the victim's body and address were inadmissible under the inevitable discovery doctrine. *Id.* The court of appeals declined to address that argument because the trial court alternatively concluded that the evidence was admissible under the independent discovery doctrine, and Petitioner had not challenged that conclusion. *Id.*

After direct appeal proceedings concluded, Petitioner filed his Rule 6.502 motion, in which he argued, *inter alia*, that the trial court erred by making a determination regarding Petitioner's mental capacity at the time he waived his *Miranda* rights without first consulting a mental health professional or ordering a psychological evaluation. (ECF No. 10-14, PageID.1481.) On April 12, 2018, the trial court entered an order authorizing Petitioner to undergo an evaluation to "address the issue of Competency to Waive *Miranda* Rights." (ECF No. 10-17.) That evaluation was conducted by forensic psychologist Jeffrey Wendt on April 11, 2019. (*Id.*, PageID.1683.)

During the evaluation, Petitioner told Dr. Wendt that "he had started using cocaine at age 23, and first smoked crack cocaine at age 25." (*Id.*, PageID.1684.) Petitioner described that he would engage in "binge smoking," i.e., "he would abstain from crack cocaine use for varying

lengths of time and then go on a three day binge." (*Id.*) Petitioner used crack cocaine from 2002 until his arrest in 2010, and when asked if he had felt addicted to crack cocaine, Petitioner responded, "Definitely." (*Id.*) Petitioner reported that he often used alcohol before and after using crack cocaine. (*Id.*) He also "said that he had been abusing prescription pain medication prior to his arrest." (*Id.*)

After interviewing Petitioner and reviewing pertinent records, including the videos of the interrogation sessions, Dr. Wendt opined that "the most significant factors influencing [Petitioner's] mental state during the time in question were acute cocaine withdrawal and sleep deprivation." (*Id.*, PageID.1694.) Dr. Wendt noted that it "appears that [Petitioner's] contact with reality was impaired during the time in question. [Petitioner] told me that he had been hallucinating, seeing people on roofs[,] and perceiving that cars were following him." (*Id.*) Overall, Dr. Wendt noted his opinion that "the combination of the factors described in this report would have compromised [Petitioner's] capacity to make a knowing and intelligent waiver of rights." (*Id.*, PageID.1696.)

The trial court conducted a hearing regarding Petitioner's Rule 6.502 motion on December 10, 2020. (ECF No. 10-19.) On June 8, 2021, the trial court entered an opinion and order granting Petitioner's Rule 6.502 motion. *See Brown*, 2021 WL 10564394, at *15. The trial court concluded that the *Miranda* warnings given to Petitioner were ineffective. *See id.* at *6. Notably, the trial court concluded that the "most concerning portion of the police interrogation can be seen on the video footage" and "raise[d] this issue of its own accord in the interests of justice and fairness." *Id.* at *7. Specifically, the trial court wrote:

> During the first two rounds of questioning, [Petitioner] made incriminating statements and was wearing his own clothing. He was then ordered to submit to DNA collection and to change into an inmate uniform. It was only after changing into the uniform that *Miranda* warnings were read to [Petitioner] for the first time.[]

Questioning resumed and [Petitioner] repeated his incriminating statements after
prompting by the detective.

When [Petitioner] was placed in a jail uniform, it affected his understanding of his
constitutional rights. Being forced to change into a jail uniform put focus on his
imminent incarceration and anything said afterwards would seem insignificant[.]
Being treated like an inmate before the warnings were given did not help
[Petitioner] consider the full consequences of repeating his prior statements. The
warnings presented by the police lost all effectiveness because [Petitioner] could
not reasonably believe he could refuse to speak with the police at the moment he
was asked to waive his rights. It would also have been hard to comprehend that
prior statements made before the warnings could not be used against him. The
uniform had a coercive effect on [Petitioner's] understanding and decision making
regarding the waiver of his rights.

Additionally, the jury watched the footage of [Petitioner] being questioned in the
jail uniform. The Court takes measures, in general, to ensure defendants are not
seen in jail attire during trial to avoid undue prejudice from jurors viewing someone
dressed as a criminal. *People v. Shaw*, 381 Mich. 467, 474 (1969). Showing video
of [Petitioner] dressed in the uniform to the jury produced the same prejudicial
effect. The jury was no longer impartial after footage of [Petitioner] in the jail outfit
was viewed as they saw him dressed as a convict and not as someone presumed to
be innocent. *Id.*

The *Seibert* factors indicate that the *Miranda* warnings given after incriminating
statements were rendered ineffective and [Petitioner] did not voluntarily,
knowingly, and intelligently waive his right against self-incrimination. The
circumstances created a highly coercive environment where [Petitioner] did not
believe he could refuse to answer the police. Any statements made after the
warnings should have been inadmissible in their entirety along with the video
footage of [Petitioner] making them.

*Brown*, 2021 WL 10564394, at *7 (footnote omitted).

The trial court went on to conclude that "[b]ut for the use of incriminating statements from

the third round of police questioning, a jury would likely have acquitted [Petitioner], relying on

the remaining evidence." *See id.* at *10. The court also noted that counsel was ineffective for

failing to present expert testimony to "provide[] jurors insight into the psychological state of

[Petitioner] during police questioning." *Id.* at *11.

30

The trial court also addressed Petitioner's argument that the court erred when "there was suppressed evidence that came forward during direct examination and[] a mistrial should have been granted." *Id.* at *13. The court concluded that Petitioner's argument had merit, stating:

> Defense counsel objected at trial when the prosecutor was about to encroach into suppressed evidence on direct examination of Detective Gill. A brief sidebar was held and the parties agreed to avoid the use of suppressed statements that [Petitioner] made. Instead, the par[t]ies agreed to have the detective testi[f]y the location of the victim's body was obtained through independent investigation by police and not from [Petitioner's] statements. When direct examination resumed, the prosecutor immediately asked about the location of the victim's body and the detective testified it was [Petitioner] that had given police that information.
>
> Trial counsel mentioned a mistrial might be necessary and this Court agreed it would be a possible option, but defense counsel ultimately advised [Petitioner] that a curative measure would overcome the error. Corrective actions were not taken until after the lunch recess, after more than two hours passed and the jury had time to reflect on the testimony stemming from suppressed information. The prosecutor asked the detective to testify to the contrary of what was said before the recess, that it was not [Petitioner] who revealed the whereabouts of the body, but discovered independently through police investigation. While the reason given for this adjustment was to avoid drawing attention, it was an attempt to retract an incriminating statement but only further highlighted the incriminating information. Because the previous error remained part of the record and was not stricken, the jury was able to consider both the erroneous and permissible parts of the testimony during deliberation when they should have not been exposed to the suppressed information at all. The curative measure did not address the error as would a new trial free from inadmissible statements. A mistrial should have been pursued by defense counsel and this argument has merit.

*Id.* at *14. On August 19, 2021, the trial court denied the State's motion for reconsideration. *See People v. Brown*, No. 10-631-FC, 2021 WL 10564390 (Mich. Cir. Ct. Aug. 19, 2021).

The Michigan Court of Appeals subsequently granted the State leave to appeal the grant of Petitioner's Rule 6.502 motion. On appeal, the State "argue[d] that the trial court relied on nonexistent facts, improperly assessed the evidence and legal standards, and abused its discretion by granting the motion." *See Brown*, 2023 WL 2051898, at *1. The court of appeals agreed and "reverse[d] and remand[ed] for entry of an order denying the motion for relief from judgment." *Id.*

Notably, the court of appeals took issue with the trial court *sua sponte* considering the effect of Petitioner wearing a jail uniform during his third statement to law enforcement. *See id.* at *4. The court of appeals agreed with the State that there was no indication in the record that Petitioner's attire "had any effect on [Petitioner's] understanding of his rights. Also problematic is that [Petitioner] never raised this issue and the record contains neither evidence nor argument that would support good cause for failing to raise it." *Id.*

The court of appeals also rejected the trial court's conclusion that Petitioner should have received a psychological evaluation regarding his mental state at the time he made his *Mirandized* statement. The court of appeals concluded that Petitioner had failed to meet his burden of demonstrating that Dr. Wendt's report was newly discovered evidence for purposes of Rule 6.508(D)(2). *See id.* at *5. Because the sole question before the trial court should have been whether the report constituted new evidence, and because Petitioner failed to meet his burden of demonstrating such, the court of appeals concluded that the trial court abused its discretion by granting relief as to that issue. *Id.* at *6. The court of appeals noted further that the trial court should not have granted relief on the basis that Petitioner's subsequent confession was not voluntary because the issue had been raised and decided on direct appeal. *Id.*

### 2.    Pertinent Authority

No person "shall be compelled in any criminal case to be a witness against himself." *See* U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that, in order to protect an individual's Fifth Amendment right against self-incrimination, when an individual is in custody, law enforcement must warn that individual, before interrogation begins, of the following rights: (1) the right to remain silent; (2) that any statement made may be used against him; (3) and that he has the right to retained or appointed counsel. *See* 384 U.S. 436, 478–79 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).

*Miranda* warnings are only required when a suspect is subject to "custodial interrogation." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). The "ultimate inquiry" for determining whether custodial interrogation occurred is whether the individual being interrogated was subject to a "restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury*, 511 U.S. at 322). "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). As the Supreme Court has stated:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances,[] would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983) *(per curiam)* (quoting *Mathiason,* 429 U.S. at 495, 97 S. Ct., at 714). The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d). The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). Factors to consider when determine whether custodial interrogation occurred include: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Hinojosa*, 606 F.3d at 883.

An individual may waive his *Miranda* rights if he does so "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. "A suspect waives his rights knowingly and intelligently if he 'understand[s] the basis privilege guaranteed by the Fifth Amendment,' but he need not

comprehend 'every possible consequences of a waiver." *Wesson v. Shoop*, 17 F.4th 700, 704 (6th Cir. 2021) (quoting *Colorado v. Spring*, 479 U.S. 564, 574–75 (1987)). A waiver is voluntary if the individual's decision to speak is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

As the Sixth Circuit has noted with respect to whether a waiver of *Miranda* rights has been coerced:

> In requiring a waiver to be voluntary, the Fifth Amendment does not concern itself "with moral and psychological pressures to confess emanating from sources other than official coercion," say a fervid conscience, for the "privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (quotation omitted). A prerequisite to finding that a defendant involuntarily waived his *Miranda* rights is some element of official coercion. A waiver is coerced if "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). The coercion inquiry looks to several potential considerations: the age, education, and other characteristics of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep, or other creature comforts. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (consent to search).

*Wesson*, 17 F.4th at 704. Notably, "simply being under the influence [of drugs or alcohol] during an interview is not nearly enough to overcome a *Miranda* waiver." *United States v. Washington*, No. 21-5745, 2022 WL 1224553, at *3 (6th Cir. Apr. 26, 2022).

### 3.    Grounds Implicating the Voluntariness of Petitioner's Waiver of *Miranda* Rights

Petitioner raises several grounds challenging the court of appeals' conclusions that Petitioner's waiver of his *Miranda* rights was done voluntarily. The Court considers each in turn below.

### a.    Ground III—Voluntariness and Multiple Statements

In ground III, Petitioner argues that the court of appeals' decision "on the voluntariness of the Petitioner's *Miranda* waiver, including its analyzing under *Seibert*[,] was based on an unreasonable interpretation of the facts and is in direct contradiction to several clearly established Federal laws." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.480.) The Court considers each of Petitioner's arguments in turn below.

### i.    Voluntariness

On direct appeal, the Michigan Court of Appeals stated the following with respect to Petitioner's challenge to the voluntariness of his *Miranda* waiver:

> Next, [Petitioner] contends that his confession and the waiver of his *Miranda* rights were involuntary and the admission of his confession at trial violated his Due Process rights and Fifth Amendment right against self-incrimination. Specifically, [Petitioner] argues that his confession and the waiver of his *Miranda* rights was the result of police coercion, sleep deprivation, drug use, and a preexisting physical injury, which resulted in an involuntary confession. We disagree.

> "[T]he state bears the burden of proving that the confession was voluntarily given by the defendant, thereby fulfilling the due process guarantee of the Fourteenth Amendment." *People v. Cheatham*, 453 Mich. 1, 13; 551 N.W.2d 355 (1996); *see also People v. Daoud*, 462 Mich. 621, 631; 614 N.W.2d 152 (2000). Moreover, "if the confession was the result of custodial interrogation, the state must prove that the police properly informed the defendant of his *Miranda* rights and obtained a valid waiver." *Cheatham*, 453 Mich. at 13. The analysis for whether [Petitioner's] confession was voluntary is essentially the same as whether the waiver of his *Miranda* rights was voluntary. *People v. Ryan*, 295 Mich. App 388, 397; —— NW2d —— (2012).

> When confronted with a challenge to the voluntariness of the confession, a trial court must consider:

>> whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired. The line of demarcation is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.
>
> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [*Ryan*, 295 Mich. App at 396–397, quoting *People v. Cipriano*, 431 Mich. 315, 333–334; 429 N.W.2d 781 (1988).]

Under this totality test, the trial court did not err in finding that [Petitioner's] third statement to the police was voluntary and admissible. [Petitioner] was approximately 36 years old, he attended college for an amount of time, and he had a lengthy criminal record. During his interrogation, he was allowed to use the bathroom several times and was given several glasses of water and coffee. Although he was in pain from a previous leg injury, he did not require medical attention and the injury did not affect his ability to converse in a responsive manner.

There is also no indication that [Petitioner's] alleged drug use interfered with his ability to assert his free will. While "[i]ntoxication from alcohol or other substances can affect the validity of a waiver, [it] is not dispositive." *People v. Gipson*, 287 Mich. App. 261, 265; 787 N.W.2d 126 (2010). [Petitioner] was responsive to the officer's questions and gave no indication that he failed to comprehend what was happening or what was being asked of him. Moreover, while [Petitioner] avers that he was without sleep, he was able to sleep for approximately an hour before giving the third statement to police. Therefore, based on the totality of the circumstances, the trial court did not err in admitting the third statement, as "[d]efendant's will was not overborne, nor was his capacity for self-determination critically impaired. The record reflects that the confession was not the result of intimidation, coercion, or deception." *See Ryan*, 295 Mich. App at 398.[4]

_____

[4] While [Petitioner] also alleges in his Standard 4 brief that the interrogating officer made promises of leniency, the interrogation video actually reveals that the officer specifically stated that he had no control over the charges brought against [Petitioner].

*Brown*, 2012 WL 3536982, at *4–6.

Petitioner now contends that the court of appeals' analysis was an unreasonable interpretation of the facts because, although he had a lengthy criminal record at the time of this arrest, Petitioner "had never been *Mirandized* or questioned in any fashion, other than for identification purposes, nor had he ever been to prison." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.480.) Instead, "[a]ll of the misdemeanor charges were arrests made on the scene and no questioning was involved." (*Id.*)

Petitioner also takes issue with the court of appeals' conclusion that no medical attention was required for Petitioner's ankle at the time of his interrogation. (*Id.*, PageID.481.) Petitioner states that he was on crutches at the time of his arrest and had "told the police he had shattered his ankle into 29 pieces 75 days earlier and had 9 screws and 2 plates in his ankle." (*Id.*) Petitioner told officers that he believed he had broken his ankle again and was attempting to treat the pain by taking double the amount of OxyContin and Percocet that had been prescribed to him. (*Id.*) Petitioner suggests that the "DVD of the interrogation shows [him] crying out in pain, holding his ankle, rocking back and forth saying ouch, ouch, ouch for the entirety of the 8 hours he was in the interrogation room." (*Id.*) Petitioner suggests that his version of events is supported by the fact that "after begging the Ingham County Jail's medical services for over 6 weeks," he was taken to his orthopedic surgeon, who determined that Petitioner had re-broken his ankle. (*Id.*)

Petitioner also describes the court of appeals' conclusion that Petitioner's drug abuse did not interfere with his ability to comprehend what was happening as "fantastical." (*Id.*) Petitioner avers that he told "the detective he was hallucinating." (*Id.*) Petitioner argues that he "had not slept for five days, . . . was hearing voices and seeking weird dream[-]like visions[,] and that he blacked out while being read the second *Miranda* question." (*Id.*)

Petitioner reiterates these arguments in his reply. (ECF No. 17.) He also notes that, although he had taken some college courses, the court of appeals failed to consider his "poor grades and [shoddy] attendance" when considering whether his waiver of *Miranda* rights was voluntary. (*Id.*, PageID.5535.) Petitioner "finds this limited amount of college, when considering the grades that were embarrassingly low, would [a]ffect this variable." (*Id.*)

Despite Petitioner's arguments, this Court's review of the record leads to a conclusion that the Michigan Court of Appeals' determination regarding the voluntariness of Petitioner's waiver of his *Miranda* rights is neither contrary to, nor an unreasonable application of, clearly established federal law. Throughout his pleadings, Petitioner suggests that the court of appeals simply relied upon the transcripts of the *Walker* and other suppression hearings and did not view the DVD of the interrogations, and that a different outcome would result "after a competent person views the DVD." (ECF No. 17, PageID.5536.) However, as set forth above, footnote four of the court of appeals' opinion explicitly references video footage of Petitioner's interrogation, suggesting that the video was considered by the court of appeals when it concluded that Petitioner's *Miranda* waiver was voluntarily made.

Despite Petitioner's averments set forth above, he has offered no evidence, much less clear and convincing evidence, to overcome the court of appeals' factual determinations regarding the voluntariness of Petitioner's waiver of *Miranda* rights. Notably, at no time did Petitioner testify under oath at the *Walker* hearing or at any other suppression hearing conducted by the trial court. As thoroughly set forth above, by the time Petitioner had waived his *Miranda* rights, he did not appear to be under the influence of drugs, and at no time did he ask for medical attention for his ankle despite appearing to be in pain. Officer Gill testified that despite Petitioner's pain, it did not appear to affect Petitioner's understanding of what was happening. Petitioner was able to sleep,

albeit intermittently, before waiving his rights, and at no time did he indicate any failure to comprehend what was happening. Overall, the court of appeals properly analyzed the totality of the circumstances and concluded that Petitioner's waiver of his *Miranda* rights was voluntarily made. Under the deference required by AEDPA, and given the factors supporting the finding that Petitioner's waiver was voluntary, Petitioner has failed to demonstrate that the court of appeals' decision was contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to this aspect of habeas ground III.

### ii.    Multiple Statements

Petitioner also takes issue with the Michigan Court of Appeals' conclusion that Petitioner was not entitled to relief on the basis that his last statement should have been suppressed because it was obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.482.)

Notably, "[s]uppression [of statements] may be proper when police deliberately employ a two-step interrogation tactic designed to circumvent *Miranda* warnings." *United States v. Leyva*, No. 18-2440, 2020 WL 2614617, at *5 (6th Cir. Jan. 9, 2020) (citing *Missouri v. Seibert*, 542 U.S. 600, 605–06 (2004) (Souter, J., plurality)). As the Sixth Circuit has noted:

> In *Seibert*, a four-justice plurality articulated the following five-factor test for determining "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object": (1) the completeness and detail involved in the first interrogation; (2) the overlapping content of the pre- and post-*Miranda* statements; (3) the timing and setting of the interrogations; (4) the continuity of police personnel during the two interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* (quoting *Seibert*, 542 U.S. at 615). Thus, "[i]f police officers coerce a suspect in custody or 'undermine the suspect's ability to' stay silent, courts will refuse to admit even post-*Miranda*

statements." *United States v. Woolridge*, 64 F.4th 757, 760 (6th Cir. 2023) (quoting *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)).

"One fact pattern that has caught judges' attention in this area arises when the police withhold warnings until a suspect confesses, administer *Miranda*, then pressure the suspect to repeat the confession." *Id.* However, "[e]ven in such cases, post-warning statements remain admissible if the *Miranda* warnings nevertheless functioned effectively—if the warnings informed the suspect that he had a genuine choice to continue speaking." *Id.* (citing *Seibert*, 542 U.S. at 611–12 & n.4). Accordingly, "[a]bsent an interrogation of this sort or another coercive tactic, the admissibility of a post-warning statement turns 'solely' on whether the suspect spoke 'knowingly and voluntarily.'" *Id.* (quoting *Elstad*, 470 U.S. at 309).

On direct appeal, the Michigan Court of Appeals rejected Petitioner's *Seibert* claim, stating:

> Next, [Petitioner] asserts that since his first two statements were obtained without notice of his *Miranda* rights, his last statement was impermissibly tainted even though he waived his *Miranda* rights before giving the statement. [Petitioner] cites the United States Supreme Court's plurality opinion in *Missouri v. Seibert*, 542 U.S. 600, 612–614; 124 S. Ct. 2601; 159 L. Ed. 2d 643 (2004), where the Court suppressed a confession that resulted from a deliberate two-step interrogation process. In *Seibert,* the police failed to give the respondent her *Miranda* warnings when first questioning her. *Id.* at 604–605. After the respondent confessed, the police then gave her *Miranda* warnings, and had her reiterate her confession. *Id.* The Court held that the latter statement was inadmissible and the "circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 617.

> That type of two-step interrogation process did not occur in this case. In *Siebert* [sic], 542 U.S. at 605, the time lapse between the two statements was only 20 minutes. In this case, over four hours passed between [Petitioner's] first statements and his subsequent *Mirandized* statement. [Petitioner] was even able to sleep in the interim. This significant time lapse provided [Petitioner] with the ability to regroup and reevaluate, and "a reasonable person in [Petitioner's] shoes could have seen" the latter questioning "as a new and distinct experience, and the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the

earlier admission." *People v. Steele*, 292 Mich. App 308, 320; 806 N.W.2d 753 (2011) (internal quotations and citation omitted); *see also Bobby v. Dixon*, ⸺ U.S. ⸺, ⸺; 132 S. Ct. 26; 181 L. Ed. 2d 328 (2011), (Docket No. 10–1540, issued November 7, 2011) (slip op. at 9), quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment) (stating that "'[f]or example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.'").

Moreover, [Petitioner's] later *Mirandized* statement varied significantly from his initial statements. [Petitioner] initially stated that he went over to the victim's house with Morse, Morse entered the house and exited with a gun, and Morse said that the victim gave him $4,000. While [Petitioner] admitted that he thought the victim might be dead, this was only because it was unlikely that the victim giving Morse $4,000 and the victim had not returned [Petitioner's] phone calls. Over four hours passed with [Petitioner] in the interrogation room, where he was allowed to sleep, drink, and use the bathroom. The interrogating police officer then returned and informed defendant that he was being charged with first-degree murder. The officer informed [Petitioner] of his *Miranda* rights, which defendant waived. Defendant then admitted that he went to the victim's house with Morse to "generate money." [Petitioner] admitted that he was actually inside the victim's house at the time of the murder, that Morse came in with a gun and a mask, and Morse pointed the gun at both [Petitioner] and the victim. [Petitioner] then confessed that, based on what Morse told [Petitioner], [Petitioner] went crazy and suffocated the victim to death. Hence, just like the United States Supreme Court found in *Bobby,* ⸺ U.S. at ⸺ – (slip op at 8) (emphasis in original), "there is no concern here that police gave [the defendant] *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, [the defendant] *contradicted* his prior unwarned statements when he confessed to [the] murder."

*Brown*, 2012 WL 3536982, at *6–7.

Petitioner now contends that the court of appeals "misapplie[d] the facts of this case in an erroneous comparison to *Seibert*." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.482.) Petitioner argues that he was "not allowed to sleep for an hour. In fact, he was instructed he couldn't sleep anywhere in the room." (*Id.*) Petitioner avers that he was "force-fed" 96 ounces of 'strong police station coffee in a three[-]hour period" and then "physically and mentally crashed on the floor, forced to use his dirty work boots as a pillow." (*Id.*) According to Petitioner, he "actually never

slept for more than 5-10 minutes without sitting up out of a dead sleep, grabbing his ankle[,] and yelling 'OUCH!'" (*Id.*)

Petitioner argues that, like in *Seibert*, his last interrogation was not a "new and distinct experience" because "he was in the same room, was interrogated by the same detective, escorted to the bathroom by the same officer[,] and was questioned four times about the same incident in the same manner." (*Id.*) Petitioner contends further that the court of appeals' conclusion that his *Mirandized* statement varied significantly from his previous statements is "wholly incredible and comical" because, as Petitioner states, "[n]early every question the Detective made during the . . . final interrogation started with or was based on 'what you said earlier' or 'earlier, you talked about this, tell me more about that,' or would strategically phrase a question in the same manner as an earlier answer." (*Id.*)

Again, despite Petitioner's arguments, this Court's review of the record leads to a conclusion that the Michigan Court of Appeals' determination regarding Petitioner's *Seibert* claim is neither contrary to, nor an unreasonable application of, clearly established federal law. Like Petitioner did with his voluntariness claim, Petitioner suggests that the court of appeals essentially disregarded the DVD of the interrogations and instead relied solely upon what the detectives testified to during the *Walker* hearing. However, this Court has already noted that the court of appeals explicitly referenced video footage of the interrogation in footnote four of its opinion, suggesting that the video was considered by the state courts when it rejected Petitioner's claims implicating *Miranda*.

Despite Petitioner's averments, he has offered no evidence, much less clear and convincing evidence, to overcome the court of appeals' factual determinations concluding that the two-step interrogation process at issue in *Seibert* was not employed in Petitioner's case. Granted, Detective

Gill conducted both the un-*Mirandized* and the *Mirandized* interrogations of Petitioner, and those interrogations occurred in the same interview room. However, the court of appeals properly noted that quite a bit of time passed between those interrogations, and that Petitioner was able to get some sleep, even if, as Petitioner suggests, that sleep was not restful. Moreover, the Court has summarized the *Walker* hearing above, and the summary corroborates the court of appeals' conclusion that Petitioner's *Mirandized* statement varied from his initial statements. Again, notably, at no time did Petitioner testify under oath at the *Walker* hearing or at any other suppression hearing conducted by the trial court to set forth his version of events.

In light of the foregoing, the Court cannot agree with Petitioner that this was a case where officers coerced him or undermined his ability to stay silent, both of which would have mandated the suppression of Petitioner's post-*Miranda* statements. *See Woolridge*, 64 F.4th at 760. (quoting *Elstad*, 470 U.S. at 309). On the contrary, the court of appeals properly concluded that Petitioner's post-*Miranda* statements remained admissible under *Seibert* because the *Miranda* warnings "nevertheless functioned effectively—[they] informed [Petitioner] that he had a genuine choice to continue speaking." *Id.* (citing *Seibert*, 542 U.S. at 611–12 & n.4). Accordingly, "[a]bsent an interrogation of this sort or another coercive tactic, the admissibility of a post-warning statement turns 'solely' on whether the suspect spoke 'knowingly and voluntarily.'" *Id.* (quoting *Elstad*, 470 U.S. at 309). Under the deference required by AEDPA, Petitioner has failed to demonstrate that the court of appeals' rejection of his *Seibert* argument was contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to this aspect of habeas ground III.

### iii.    Summary

In sum, Petitioner has not demonstrated that the court of appeals' rejection of his claim that

he did not voluntarily waive his *Miranda* rights, as well as his claim that *Seibert* precluded

admission of his post-*Miranda* statements, was contrary to, or an unreasonable application of,

clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas

ground III.

### b.    Ground XVI—Forensic Psych Evaluation

In ground XVI, Petitioner argues that the trial court "was correct when it considered the

forensic psych evaluation to determine that the [last] interrogation needed to be 'scrubbed' in its

entirety as [P]etitioner did not knowingly and intelligently waive *Miranda*." (Br. Supp. Am. § 2254

Pet., ECF No. 7, PageID.520.) Petitioner argues further that the court of appeals "failed to make

an unambiguous or definitive ruling on the second prong of *Miranda*[,] making the trial court's

6/8/20 ruling the last state court decision on the merits." (*Id.*)

With respect to the forensic evaluation of Petitioner performed by Dr. Wendt, the trial court

wrote:

> In regards to trial counsel's failure to investigate [Petitioner's] mental health,
> [Petitioner] argues his counsel was deficient in not calling an expert witness to give
> testimony on [Petitioner's] mental state during police questioning. In *People v.
> Cipriano*, 431 Mich. 315 (1988), the high Court discussed several factors to
> determine if a statement is voluntary. These include experience, education, injury,
> intoxication, illegal drug use, deprivation of food, and lack of sleep. *Id*. at 334. A
> supplemental brief was submitted by [Petitioner] with the findings of Dr. Jeffrey
> Wendt, Ph.D., P.C. The doctor reviewed recordings of the police interview and the
> demeanor of [Petitioner] during the interview in comparison to his demeanor when
> sober.
>
> Plaintiff argues [Petitioner] had prior interactions with law enforcement and was
> familiar with *Miranda* warnings and understood the waiver of those rights.
> However, during questioning, [Petitioner] was hallucinating, in physical pain, and
> had trouble with motor functions. He stated he could not tell what was real and
> what was not[.] There was pain in [Petitioner's] ankle, and he could not sit
> comfortably in the chair in between the rounds of questioning and laid on the floor

instead. He also knocked over a cup of coffee when he was having trouble sitting still.

Dr. Wendt observed [Petitioner] was not in his usual state of mind, suffering from lack of sleep and cocaine withdrawal through the doctor's viewing of the police interview on video. During questioning, [Petitioner] stated, "I'm not really sure what I've said since I've been here," and "I've been having some really weird dreams man." After *Miranda* rights were read and the detective asked if [Petitioner] understood them, he mentioned, "I've been tweaking and twacking and feeling like, there's fucking people behind me." Dr. Wendt concluded in his report that [Petitioner's] physical and mental states were so strained that he could not fully understand his rights and the consequences of waiving those rights. Inclusion of expert testimony of the doctor would have provided jurors insight into the psychological state of [Petitioner] during police questioning and likely affected the outcome of the trial. This claim has merit.

*Brown*, 2021 WL 10564395, at *10–11. Thus, while Petitioner suggests that the trial court's ruling regarding Dr. Wendt's report concerned whether Petitioner could knowingly and intelligently waive his *Miranda* rights (i.e., the second *Miranda* prong), the analysis set forth above suggests that the trial court conflated the question of a knowing and intelligent waiver with the question of whether the waiver was voluntarily made.

On the State's appeal from the grant of Petitioner's Rule 6.502 motion, the court of appeals rejected the trial court's conclusions, stating:

[Petitioner] argued that he did not voluntarily waive his *Miranda* rights. The prosecution asserts this argument was raised and rejected in [Petitioner's] earlier appeal, and that Dr. Wendt's opinions in the psychological evaluation do not change this Court's earlier conclusions regarding the voluntariness of the statement at issue.

When deciding a motion for relief from judgment, one of the first questions a trial court should ask is whether the defendant "alleges grounds for relief which were decided against the defendant in a prior appeal." MCR 6.508(D)(2). In [Petitioner's] earlier appeal, he "contend[ed] that his confession and waiver of his *Miranda* rights were involuntary and the admission of his confession at trial violated his Due Process rights and Fifth Amendment right against self-incrimination." *Brown*, unpub. op. at 5. [Petitioner] specifically argued "that his confession and the waiver of his *Miranda* rights w[ere] the result of police coercion, sleep deprivation, drug use, and a preexisting physical injury, which resulted in an involuntary confession." *Id.* Using a totality-of-the-circumstances test, we concluded that "the trial court did not err in finding that defendant's third statement

45

to the police was voluntary and admissible." *Id.* at 6. We further stated that there was "no indication that defendant's alleged drug use interfered with his ability to assert his free will." *Id.*

In his motion for relief from judgment, [Petitioner] argued he was entitled to relief from judgment because he was not provided a psychological evaluation regarding his mental state at the time he made his third statement to the police. [Petitioner] claims that the waiver of his *Miranda* rights was ineffective because, when he made that statement, he was sleep-deprived and under the influence of substances. [Petitioner's] supplemental brief in support of his motion for relief from judgment underscored Dr. Wendt's evaluation as evidence that his confession and waiver of his *Miranda* rights were involuntary. The appellate record demonstrates that [Petitioner's] present argument regarding the voluntariness of his post-*Miranda* statement was raised and decided against [Petitioner] in an earlier appeal.

We note, however, that Dr. Wendt's report was not part of the record in the earlier appeal. As such, the next question is whether this report is "new evidence" under MCR 6.508(D)(2). This analysis generally requires a court to consider whether the defendant demonstrated that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v. Cress*, 468 Mich. 678, 692; 664 N.W.2d 174 (2003) (quotation marks and citation omitted). But, in this case we need not analyze these factors because the burden was on *defendant* to demonstrate Dr. Wendt's report satisfied the newly-discovered evidence standard under MCR 6.508(D)(2). [Petitioner's] supplemental brief, which was filed after Dr. Wendt issued his report, made no such argument.

The trial court nevertheless analyzed the issue, and engaged in extensive discussion whether, under the circumstances surrounding his third statement to the police, [Petitioner] was capable of waiving his rights under *Miranda*. The trial court concluded that, given [Petitioner's] state of mind at the time he made his statement to the police, he could not freely waive his rights. However, the trial court's analysis fails to recognize that this Court had already decided this same issue in [Petitioner's] earlier appeal. The sole question before the trial court should have been whether Dr. Wendt's report was "new evidence" under MCR 6.508(D)(2). Because [Petitioner] failed to argue the factors for newly-discovered evidence, he could not meet his burden of establishing that he was entitled to relief from judgment, and the trial court should have rejected [Petitioner's] arguments. As such, the trial court abused its discretion in granting relief from judgment as to this issue.

*Brown*, 2023 WL 2051898, at *5–6.

In light of the fact that the trial court's analysis conflated the question of whether Petitioner could knowingly and intelligently waive his rights with whether he voluntarily did so, the Court cannot agree with Petitioner that the court of appeals did not rule upon the second prong of *Miranda*. Thus, the court of appeals' decision constitutes the last state court decision on the merits.

In any event, Petitioner is simply not entitled to federal habeas relief with respect to this claim. As noted above, the court of appeals concluded that Dr. Wendt's report did not constitute new evidence under Michigan Court Rule 6.508(D)(2) that would permit the trial court to revisit the issue of Petitioner's *Miranda* waiver since the court of appeals had decided the same issue on direct appeal. Thus, the court of appeals rejected Petitioner's ground solely based upon state law.

The United States Supreme Court "repeatedly has held that the state courts are the ultimate expositors of state law" in federal habeas proceedings." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Thus, "federal habeas corpus relief does not lie for errors of State law." *See id.* at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). For these reasons, this Court will not disturb the court of appeals' ruling that the trial court abused its discretion by considering Dr. Wendt's report as new evidence regarding the propriety of Petitioner's *Miranda* waiver under Michigan Court Rule 6.508(D)(2). Petitioner, therefore, is not entitled to relief with respect to habeas ground XVI.

### c.    Ground XVIII—"Jail Garb"

In ground XVIII, Petitioner contends that the court of appeals' analysis of the trial court's conclusion regarding the fact that Petitioner was in "jail garb" when he waived his *Miranda* rights "fails to offer a complete ruling and only offers explanation of the second half of the trial court's reasoning making it based on a clearly unreasonable application of the facts of the case and the trial court's decision." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.528.)

47

In the opinion and order granting Petitioner's Rule 6.502 motion, the trial court wrote:

The most concerning portion of the police interrogation can be seen on the video footage and has more weight than the other non-exhaustive factors put forth in *Seibert*. The higher Court noted that issues cannot generally be raised after trial absent a showing of manifest injustice. *People v. Leach*, 114 Mich. App. 732 (1982). "[N]o general definition of manifest injustice has ever been developed ... a showing of manifest injustice requires that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." *U.S. v. Alien*, No. C.R. 14-20191, 2020 W. L. 4592901, at *1 (ED. Mich. Aug. 11,2020). This Court raises this issue of its own accord in the interests of justice and fairness.

During the first two rounds of questioning, [Petitioner] made incriminating statements and was wearing his own clothing. He was then ordered to submit to DNA collection and to change into an inmate uniform. It was only after changing into the uniform that *Miranda* warnings were read to [Petitioner] for the first time.[] Questioning resumed and [Petitioner] repeated his incriminating statements after prompting by the detective.

When [Petitioner] was placed in a jail uniform, it affected his understanding of his constitutional rights. Being forced to change into a jail uniform put focus on his imminent incarceration and anything said afterwards would seem insignificant[.] Being treated like an inmate before the warnings were given did not help [Petitioner] consider the full consequences of repeating his prior statements. The warnings presented by the police lost all effectiveness because [Petitioner] could not reasonably believe he could refuse to speak with the police at the moment he was asked to waive his rights. It would also have been hard to comprehend that prior statements made before the warnings could not be used against him. The uniform had a coercive effect on [Petitioner's] understanding and decision making regarding the waiver of his rights.

Additionally, the jury watched the footage of [Petitioner] being questioned in the jail uniform. The Court takes measures, in general, to ensure defendants are not seen in jail attire during trial to avoid undue prejudice from jurors viewing someone dressed as a criminal. *People v. Shaw*, 381 Mich. 467, 474 (1969). Showing video of [Petitioner] dressed in the uniform to the jury produced the same prejudicial effect. The jury was no longer impartial after footage of [Petitioner] in the jail outfit was viewed as they saw him dressed as a convict and not as someone presumed to be innocent. *Id*.

*Brown*, 2021 WL 10564394, at *7 (footnote omitted). On the State's appeal from that decision,

the court of appeals rejected the trial court's conclusion, writing:

This issue concerns [Petitioner's] third statement to police. Although [Petitioner] had made two previous statements, he had not been informed of his *Miranda*

warnings, so those statements were suppressed. Before making his third statement, he was given his *Miranda* warnings and was wearing a jail uniform during this video-taped statement. Without any argument from [Petitioner], the trial court concluded that [Petitioner's] confession was involuntary because [Petitioner's] wearing a jail uniform during his post-*Miranda* statement "had a coercive effect on [his] understanding and decision[-]making regarding the waiver of his rights." The prosecution argues [Petitioner's] change of clothes was not new evidence, and therefore cannot serve as grounds to grant relief from judgment. We agree that the jail uniform was not new evidence under MCR 6.508(D)(2), nor is there any indication in the record that [Petitioner's] clothing had any effect on [Petitioner's] understanding of his rights. Also problematic is that [Petitioner] never raised this issue and the record contains neither evidence nor argument that would support good cause for failing to raise it. Therefore, [Petitioner] did not meet his burden establishing grounds for relief.

Even so, the trial court apparently thought this issue was significant enough to raise this issue "of its own accord in the interests of justice and fairness." Criminal defendants in Michigan may be deprived of due process if they are compelled to be tried in jail attire. *People v. Shaw*, 381 Mich. 467, 474; 164 N.W.2d 7 (1969). Drawing a comparison to *Shaw*, the trial court concluded that in this case, "[t]he jury was no longer impartial after footage of [d]efendant in the jail outfit was viewed as they saw him dressed as a convict and not as someone presumed to be innocent."

But the trial court's reliance on *Shaw* was misplaced. *Shaw* held that criminal defendants may be deprived of due process if, *during trial*, they are forced to wear a jail uniform in the presence of the jury. *Shaw*, 381 Mich at 474. In this case, there is no evidence that [Petitioner] was dressed in a jail uniform during his trial. By itself, the fact that [Petitioner] was wearing jail garb during his police interview does not demonstrate a deprivation of due process. Moreover, the video footage of [Petitioner's] third statement was introduced at trial and available to [Petitioner] in the first appeal, yet [Petitioner] never raised his attire as an issue in his prior appeal. Thus, this was not new evidence, and it was therefore inappropriate for the trial court to consider it in the context of [Petitioner's] motion for relief from judgment. Accordingly, the trial court abused its discretion in granting the motion for relief from judgment as to this issue.

*Brown*, 2023 WL 2051898, at *4–5.

Petitioner fails to show that the court of appeals' rejection of the trial court's conclusions regarding the fact that Petitioner was in "jail garb" is contrary to, or an unreasonable application of, clearly established federal law. Petitioner cites no Supreme Court authority holding that the fact that a suspect is dressed in a jail uniform prior to waiving his or her *Miranda* rights has any

effect on the voluntariness of the waiver or automatically leads to a conclusion that the waiver was involuntary. The court of appeals correctly noted that the trial court had raised that issue *sua sponte*, without any record support for what, if any, effect the jail uniform had on Petitioner's decision to waive his *Miranda* rights. Because Petitioner fails to demonstrate that the rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to relief with respect to habeas ground XVIII.

### D.    Ground V—Prosecutorial Misconduct

In ground V, Petitioner contends that the prosecution committed misconduct by vouching for the credibility of certain witnesses, expressing belief in Petitioner's guilt during opening and closing arguments, and making assertions that were not supported by the evidence. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.488–494.) Petitioner raised these claims in his *pro per* supplemental brief on direct appeal, and the court of appeals rejected them.

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

50

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    Vouching for Witnesses and Opinions Regarding Petitioner's Guilt

Petitioner contends that the prosecution committed misconduct by vouching for the credibility of its witnesses during closing arguments. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.488.) Specifically, Petitioner argues that the prosecution vouched for the credibility of jailhouse snitch Antonio Cervantes and "star witness" Chris Stipanuk. (*Id.*) Petitioner alleges further that the prosecution engaged in misconduct when it repeatedly expressed belief regarding Petitioner's guilt during opening statements and closing arguments. (*Id.*, PageID.490.)

The Sixth Circuit has identified two types of objectionable vouching. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328–29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to enhance his or her credibility. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994). The second type, also known as bolstering, occurs when the prosecutor invites the jury to believe there

is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

Moreover, a prosecutor may not "offer [his or her] opinions as to credibility of a witness or the guilt of a defendant." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). As the Supreme Court has noted:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18–19 (1985). However, not every reference to the credibility of a witness is objectionable vouching. "[A] prosecutor may ask the jury to draw reasonable inferences of credibility from the evidence presented." *Willoughby v. White*, 786 F. App'x 506, 513 (6th Cir. 2019).

The Michigan Court of Appeals rejected Petitioner's arguments, stating:

> It is true that "a prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness [,]" *People v. Thomas,* 260 Mich. App. 450, 455; 678 N.W.2d 631 (2004), and a prosecutor may not "express [his] personal opinion of a defendant's guilt," *Bahoda,* 448 Mich. at 282–283. However, "[a] prosecutor may. . . argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief." *People v. Howard,* 226 Mich. App. 528, 548; 575 N.W.2d 16 (1997). In every statement [Petitioner] objects to about vouching for the credibility of witnesses, the prosecutor argued that the witnesses were credible because the evidence corroborated their testimony.[5] Rather than vouching for the credibility of its witnesses, the prosecution was merely concluding from the facts presented that the witnesses were credible. Similarly, each reference the prosecution made to [Petitioner] being guilty was not a personal opinion but offered only as a conclusion from the evidence presented. Furthermore, the trial court instructed the jury that the prosecution's statements were not evidence, and "[j]urors are presumed to follow the instructions of the court." *People v. Meissner,* 294 Mich. App 438, 457; 812

N.W.2d 37 (2011). [Petitioner] has failed to demonstrate plain error affecting his substantial rights.

---

[5] [Petitioner] also objects to an interchange between the prosecutor and a witness where the prosecutor clarified that the witness was testifying that he was being truthful. Rather than vouching for the witness's credibility, the prosecutor was merely reiterating the witness's testimony in order to clarify it.

*Brown*, 2012 WL 3536982, at *8 & n.5. Although the court of appeals cited to state authority for the standard, the standard relied upon is essentially the same as the standards set forth above.

Here, Petitioner primarily presents to this Court the arguments that he raised in his *pro per* supplemental brief on direct appeal—arguments that have already been rejected by the Michigan Court of Appeals. Petitioner, therefore, fails to explain how the court of appeals' analysis is in error. Moreover, Petitioner does not explain how the court of appeals' analysis is contrary to, or an unreasonable application of, the general standards set forth in *Darden* or *Donnelly*.

This Court's review of the court of appeals' determination reveals that it is entirely consistent with the clearly established federal law set forth in *Darden* and *Donnelly*. Upon review of the record, the Court concludes that where the prosecutor noted that Cervantes and Stipanuk were telling the truth, the prosecutor tied those arguments to the evidence offered at trial or reasonable inferences from that evidence. Petitioner fails to point to any part of the prosecutor's argument that suggests that the prosecutor invited the jurors to believe that those two witnesses were credible simply because the prosecutor believed that to be the case. Moreover, the prosecutor did not invite the jury to believe there was other evidence, known to the prosecutor but not introduced at trial, justifying a conclusion that Cervantes and Stipanuk were credible. Furthermore, at no time did the prosecutor place the prestige of the government behind these individuals to bolster their credibility. Likewise, the prosecutor's references to Petitioner's guilt during opening

statements and closing arguments were offered as conclusions based upon the evidence presented at trial, not because of the prosecutor's personal opinion.

The Court notes further that the trial court instructed the jury to consider only the evidence admitted at trial, and that counsel's opening statements and closing arguments did not constitute evidence. (Trial Tr. IV, ECF No. 10-10, PageID.1282.) The court of appeals' conclusion that jurors are presumed to follow their instructions is entirely consistent with federal law. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has not demonstrated that the remarks made by the prosecutor "so infected the trial with unfairness" that he was denied due process. *See Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). Petitioner, therefore, is not entitled to relief with respect to this assertion of prosecutorial misconduct.

### 2.    Assertions Not Supported by Evidence

Petitioner also contends that the prosecutor made statements that were not supported by the evidence presented at trial. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.491.) For example, Petitioner notes that during closing arguments, the prosecutor indicated that Petitioner was at the victim's home after the carpets were cleaned. (*Id.*) Petitioner contends that there is no evidence suggesting that Petitioner said that "he went to the apartment after the carpets were cleaned." (*Id.*) Petitioner argues that despite a lack of such evidence, the prosecutor noted during closing arguments that Petitioner admitted to being at the victim's home after the carpets were cleaned. (*Id.*) Petitioner also takes issue with the prosecutor's statements suggesting that Petitioner had told Stipanuk that he had killed someone, arguing that during cross-examination, Stipanuk indicated that Petitioner never told him that anyone had been hurt or that he had killed someone. (*Id.*, PageID.492.)

Petitioner raised this claim on direct appeal, and the court of appeals rejected it, stating:

> Lastly, [Petitioner] challenges that the prosecutor made statements unsupported by the evidence. Even assuming, arguendo, that the prosecution mischaracterized the evidence, "a well-tried, vigorously argued case should not be overturned on the basis of a few isolated improper remarks that could have been corrected had an objection been lodged . . . ." *People v. Green,* 228 Mich. App. 684, 693; 580 N.W.2d 444 (1998). Furthermore, the trial court specifically instructed the jury that the lawyers' comments were not evidence, were only intended to help the jury understand the evidence, and that the jury should disregard any statements that were not supported by the evidence or commons sense. Thus, "any unfair prejudice produced by the challenged comments" was "cured by the trial court's careful and explicit instructions to the jury that it was required to decide the case on the evidence alone and that the lawyer's statements were not evidence." *Green,* 228 Mich. App. at 693.

*Brown*, 2012 WL 3536982, at *8. Prior to that discussion, the court of appeals noted that it was reviewing Petitioner's prosecutorial misconduct claims for plain error because no contemporary objections had been lodged during trial. *See id.* at *7. By rejecting Petitioner's prosecutorial misconduct claims, the court of appeals essentially concluded that no plain error occurred.

"[T]he government may not rely on prejudicial facts not in evidence when making its closing arguments." *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007). Here, although the court of appeals assumed *arguendo* that the prosecutor mischaracterized the evidence, the court of appeals essentially concluded that no plain error occurred. Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, 983 N.W.2d 325, 336–337 (Mich. 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id.* The Michigan Supreme Court equates "outcome determination" to "prejudice" when separating plain from

harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when evaluating the

*Strickland* standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308

(Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal

harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as

the standard for determining whether habeas relief if appropriate "whether the . . . error 'had

substantial and injurious effect or influence in determining the jury's verdict.'"); *O'Neal v.

McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "Do I, the judge, think that the error

substantially influenced the jury's decision?"); *Brown v. Davenport*, 596 U.S. 118, 126 (2022)

(stating that "a state prisoner . . . must show that the error had a 'substantial and injurious effect or

influence' on the outcome of his trial" (quoting *Brecht*, 507 U.S. at 637)). An appellate court's

decision that the error was not outcome determinative is the equivalent of a determination that the

error was harmless under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995).

*Brown* states that "a state court's harmless-error determination qualifies as an adjudication

on the merits under AEDPA." 596 U.S. at 127. Accordingly, the Court must defer to that

adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded

juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id*. at

1525 (second alteration in original) (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). This is a

standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

In his petition, Petitioner contends that the prosecutor's "slips of tongue" caused "great

prejudice during his trial and deprived [him] of a fair trial." (Br. Supp. Am. § 2254 Pet., ECF No.

7, PageID.493.) He avers that "the people presented to the jury that [Petitioner] had confessed to

murdering the decedent to three different persons without presenting any evidence of these specific

conversations." (*Id.*) However, contrary to Petitioner's argument, the prosecution presented overwhelming evidence, including testimony from Cervantes and Stipanuk, to establish Petitioner's guilt. Petitioner fails to demonstrate that any misstatements of evidence by the prosecutor had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637, particularly in light of the fact that the trial court explicitly instructed the jury that counsels' arguments were not to be considered as evidence during their deliberations.

Given Petitioner's failure to persuade the Court that no fairminded jurist could reach the conclusion arrived at by the court of appeals, the Court will defer to the court of appeals' determination. The Court's deference to the court of appeals' conclusion that no plain error occurred, equating to a conclusion that any error was not outcome-determinative, necessarily leads to a conclusion that Petitioner has failed to demonstrate that the court of appeals' rejection of this claim of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to this assertion of prosecutorial misconduct.

### 3.    Summary

In sum, Petitioner has not demonstrated that the prosecutor engaged in misconduct by vouching for the credibility of witnesses, by expressing a personal opinion regarding Petitioner's guilt, and by asserting facts not supported by the evidence. Petitioner fails to demonstrate that the court of appeals' rejection of his claim of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground V.

### E.    Ground VI—Trial Court Error

In ground VI, Petitioner takes issue with the court of appeals' decision "regarding the trial court abusing its discretion in allowing a late endorsement of witnesses, by allowing the people to

[elicit] suppressed evidence and when it violated [P]etitioner's due process rights under the inevitable discovery doctrine." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.494.) The Court considers each of Petitioner's arguments in turn below.

### 1.    Late Endorsement of Witnesses

Petitioner argues that the State "amended [its] witness list a mere 20 days before trial to add a total of three witnesses, two of whom had been known since the discover[y] of the body some 12 months earlier." (*Id.*) According to Petitioner, two of the witnesses were crime scene investigators, and the prosecution failed to show "good cause why they were not listed at least 30 days prior to trial." (*Id.*) Petitioner argues further that the jailhouse snitch, Cervantes, was first in contact with the prosecutor eight months before trial and made "a recorded statement (proffer) well in advance of the 30 day time limit for his endorsement." (*Id.*) Petitioner contends that the allowance of these late endorsements violated his due process rights because counsel was not adequately prepared to cross-examine these witnesses. (*Id.*, PageID.495.)

The court of appeals summarily rejected this argument, stating:

> [Petitioner] argues in his Standard 4 brief that the trial court erred in allowing the prosecution to endorse three witnesses a mere 20 days before trial. However, before trial defense counsel expressed approval with the witness list and acknowledged that both parties agreed to the witnesses to be called. Thus, [Petitioner] has waived this issue for appeal. See *People v. Carter,* 462 Mich. 206, 215–216; 612 N.W.2d 144 (2000).

*Brown*, 2012 WL 3536982, at *10.

It is well settled that there is no general constitutional right to discovery in a criminal case. See *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (denying due process claim of a defendant who was convicted with the aid of surprise testimony from an accomplice who was an undercover agent); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988) (citing *Weatherford,* 429 U.S. at 559)). A decision regarding the endorsement of a witness generally constitutes a state law

matter within the trial court's discretion. *See Hence v. Smith*, 37 F. Supp. 2d 970, 982 (E.D. Mich. 1999) (citing cases); *Whalen v. Johnson,* 438 F. Supp. 1198, 1202–03 (E.D. Mich. 1977) (holding that it was not a fundamental error to permit a prosecutor to endorse a witness during trial even though the prosecutor had previously filed an affidavit stating that the witness was not material). A claim that a trial court erred in the application of state procedure or evidentiary law is not in itself a cognizable ground for federal habeas relief. *See Estelle*, 502 U.S. at 67–68; *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir.1993). Thus, any conclusion that the late endorsement of the witnesses by the prosecution was appropriate under state law is axiomatically correct.

Habeas relief may be available, however, if an evidentiary ruling "results in a denial of fundamental fairness" that violates due process. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Petitioner, however, has not established that the late endorsement of these witnesses resulted in a due process violation because there is no indication that the late endorsement meaningfully prejudiced Petitioner or rendered his trial fundamentally unfair. The record corroborates the court of appeals' notation that counsel expressed approval with the witness list. Moreover, the record reflects that counsel thoroughly cross-examined these witnesses during trial. *See Mayes v. Gibson*, 210 F.3d 1284, 1292 (10th Cir. 2000) (holding that the late endorsement of a prosecution witness did not prejudice the defendant because defense counsel conducted an adequate cross-examination and had a meaningful opportunity to explain the evidence offered). Petitioner has failed to demonstrate that the court of appeals' rejection of his claim regarding the late endorsement of these witnesses is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to this portion of habeas ground VI.

### 2. Admission of Information from a Suppressed Interview Under the Independent Discovery Doctrine

Next, Petitioner contends that the trial court abused its discretion when it allowed the prosecution to "elicit information from a suppressed interview under the independent discovery doctrine." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.495.) Specifically, Petitioner challenges the admission of testimony regarding the victim's address, as well as the discovery of the body. (*Id.*, PageID.496.)

Petitioner states that trial counsel "moved to suppress the body and the address of the deceased as they were both obtained through an illegal arrest and an un-*Mirandized* interrogation." (*Id.*) Petitioner argues:

> The trial court, in making its ruling, determined that the deceased's disability check that included his address . . . was cashed at the SUNSET MARKET. (3/16/11). The trial court based this ruling on the testimony from the people's star witness, Stipanuk, who said the petitioner told him he had taken . . . "Eric" to cash a large government check 10 days earlier at "SUNSET PARTY STORE." (p 28). Both of these stores exist in Lansing and are on opposite sides of town and are two completely different types of businesses.

(*Id.*) According to Petitioner, the trial court

> allowed the address and the discovery of the body, basing its decision on an unverified assumption that there could only be a couple places in Lansing with the name SUNSET in it and the discovery of the appropriate 'store' would have been inevitable as there would have been an independent source for the challenged information.

(*Id.*)

On appeal, Petitioner challenged the trial court's ruling regarding the inevitable discovery doctrine. The court of appeals summarily rejected Petitioner's argument, stating:

> Lastly, in [Petitioner's] Standard 4 brief, he challenges that the trial court erred in admitting evidence of the victim's body and address pursuant to the inevitable discovery doctrine. However, the trial court stated that an alternate basis for admissibility was the independent discovery doctrine, which [Petitioner] does not challenge. Therefore, we decline to address [Petitioner's] arguments, as any error

> based on the inevitable discovery doctrine would be harmless because of the alternate, unchallenged grounds of admissibility. *See* MCR 2.613.

*See Brown*, 2012 WL 3536982, at *7. Petitioner now suggests that the court of appeals erred in concluding that any error based on the inevitable discovery doctrine would be harmless and that the independent discovery doctrine would not have applied.

Like ground II, this portion of ground VI is barred by the doctrine set forth in *Stone v. Powell* because Petitioner is essentially challenging the state courts' decisions regarding the admissibility of the victim's address and body under the Fourth Amendment's inevitable discovery and independent discovery doctrines. This Court has already noted that it is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial, and that Petitioner took full advantage of that mechanism. Moreover, Petitioner has not alleged any facts showing that the State's mechanism had broken down.

Therefore, without something more, *Stone* bars this Court's consideration of the merits of Petitioner's argument that the inevitable and independent discovery doctrines did not permit admission of this evidence. *See, e.g.*, *Blackshere v. Maclaren*, No. 15-1904, 2016 WL 561521, at *3 (6th Cir. Feb. 9, 2016); *Carter v. Davids*, No. 1:19-cv-555, 2019 WL 6001698, at *14-15 (W.D. Mich. Nov. 14, 2019); *Leuluaialii v. Sinclair*, No. 09-cv-0303-RSL, 2010 WL 891015, at *10 (W.D. Wash. Mar. 8, 2010); *Matthews v. Sirmons*, No. CIV-03-417-R, 2007 WL 2286239, at *12–15 (W.D. Okla. Aug. 6, 2007). Here, Petitioner offers "nothing more" that would allow the Court to consider the merits of these specific Fourth Amendment arguments.

Accordingly, Petitioner's claim of trial court error regarding admission of statement regarding the victim's body and address, which is essentially a Fourth Amendment challenge concerning applicability of the inevitable and independent discovery doctrines, is barred on federal

habeas review. Petitioner, therefore, is not entitled to relief with respect to this portion of habeas ground VI.

### 3.    Summary

In sum, the prosecution's late endorsement of witnesses did not violate Petitioner's due process rights, and so Petitioner has failed to demonstrate that the court of appeals' rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Moreover, Petitioner's challenge to the trial court's decision to allow admission of the statement regarding the victim's address and body pursuant to either the inevitable discovery or the independent discovery doctrine is barred from federal habeas review pursuant to the doctrine set forth in *Stone v. Powell*. Accordingly, Petitioner is not entitled to relief with respect to habeas ground VI.

### F.    Ground VII—Admission of Hearsay

In ground VII, Petitioner contends that the court of appeals failed to appropriately rule on his assertion that the trial court erred "when it allowed two separate witnesses to offer hearsay testimony." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.498.) Petitioner argues that the trial court should not have allowed hearsay testimony from Stipanuk because: (1) he and Stipanuk did not have a close relationship; (2) Stipanuk was not advised of his *Miranda* rights prior to being interrogated; and (3) Stipanuk had a strong motive to lie or curry favor with authorities. (*Id.*, PageID.498–500.) Petitioner suggest further that the trial court should not have allowed hearsay testimony from Cervantes, the "jailhouse snitch," because Cervantes was essentially acting as a state actor. (*Id.*, PageID.500–502.)

On direct appeal, the court of appeals concluded that hearsay testimony from Stipanuk was admissible as the admission of a party-opponent pursuant to Michigan Rule of Evidence 801(d)(2). *See Brown*, 2012 WL 3536982, at *11. The court of appeals concluded the same regarding

Cervantes' testimony. *See id.* Furthermore, the court of appeals rejected Petitioner's argument that Cervantes was a state actor, noting that "[w]hile Cervantes contacted the FBI to inform them that he had obtained incriminating information about [Petitioner], there is no evidence that the FBI instructed or used Cervantes to elicit information." *Id.*

As an initial matter, any challenges to the court of appeals' conclusions that the testimony given by Stipanuk and Cervantes was admissible under Michigan Rule of Evidence 801(d)(2) are not cognizable on federal habeas review. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As the Supreme Court has explained, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68.

It is not inconceivable, however, that evidence properly admitted under state law might still have the effect of rendering Petitioner's trial unfair. State court evidentiary rulings, though, "cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh*, 329 F.3d at 512. This approach affords the state courts wide latitude for ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Moreover, under the AEDPA, a federal court may not grant relief if it would have decided the evidentiary question differently. A federal court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law, or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "'a Supreme Court case establishing a due process right with regard to the specific kind of evidence' at issue"). Petitioner, however, has not met this difficult standard.

First, there is nothing inherent in the admission of hearsay testimony generally that offends fundamental principles of justice. In fact,

> [t]he first and most conspicuous failing in [arguing that hearsay testimony violates due process] is the absence of a Supreme Court holding granting relief on [that] theory: that admission of allegedly unreliable hearsay testimony violates the Due Process Clause. That by itself makes it difficult to conclude that the state court of appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

*Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

While hearsay itself is not constitutionally impermissible, in some instances, testimony regarding out-of-court statements might raise the specter of a violation of the Confrontation Clause. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause,

64

therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). Here, however, no Confrontation Clause violation occurred because both Stipanuk and Cervantes testified at Petitioner's trial.

As noted above, Petitioner contends that the court of appeals erred in concluding that Stipanuk's testimony was admissible because Stipanuk was "never Mirandized before he was interrogated." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.499.) Petitioner faults the Michigan Court of Appeals for not ruling upon this assertion. First, to the extent Petitioner is challenging the lack of *Miranda* warnings given to Stipanuk, he lacks standing to do so. *See, e.g.*, *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (concluding that the petitioner lacked standing to complain about alleged infringement upon a prosecution witness's constitutional rights); *United States v. Fredericks*, 586 F.2d 470, 480–81 (5th Cir. 1978) (concluding that the co-defendant could not seek "to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of *Miranda* or otherwise in violation of that party's Fifth or Sixth Amendment rights"); *Byrd v. Comstock*, 430 F.2d 937, 938 (9th Cir. 1970) (concluding that the petitioner lacked standing to challenge the co-defendant's statement, which was made without *Miranda* warnings, because the co-defendant's right against self-incrimination was personal to the co-defendant).

Several federal courts of appeal, however, have held that, even if a petitioner does not have standing to seek suppression of a witness's statement obtained in violation of *Miranda*, habeas relief may be available for due process violations if the statement was admitted against the petitioner at trial and rendered the trial fundamentally unfair. *See, e.g.*, *Douglas v. Woodford*, 316

F.3d 1079, 1092 (9th Cir. 2003) (noting that the use of a witness's coerced confession at the trial

of another individual can violate due process because "illegally obtained confessions may be less

reliable than voluntary ones"); *Williams*, 384 F.3d at 593; *Buckley v. Fitzsimmons*, 20 F.3d 789,

795 (7th Cir. 1994) (noting that "[c]onfessions wrung out of their makers may be less reliable than

voluntary confessions, so that using one person's coerced confession at another's trial violates his

rights under the due process clause"); *cf. United States v. Merkt*, 764 F.2d 266, 274 (5th Cir. 1985)

(stating that "[a] defendant may assert her own [F]ifth [A]mendment right to a fair trial as a valid

objection to the introduction of statements extracted from a nondefendant by coercion or other

inquisitional tactics").

Nevertheless, Petitioner is not entitled to habeas relief pursuant to the foregoing precedent

because it does not constitute clearly established federal law as articulated by the Supreme Court.

*See Renico v. Lett*, 559 U.S. 766, 779 (2010) (citing 28 U.S.C. § 2254(d)(1)). The Supreme Court

has never clearly held that an accused can challenge the admission of a witness's coerced

confession. *See Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008) (discussing the lack of

Supreme Court authority on the issue). "While the Supreme Court's opinions could be read to

suggest that conclusion, any such reading necessarily would be based on the Supreme Court's

dicta, rather than on its actual holdings." *Harris v. Soto*, No. CV 15-0352 BRO (RAO), 2016 WL

2587373, at *9 (C.D. Cal. Mar. 25, 2016); *see also Williams*, 529 U.S. at 412 (explaining that the

phrase "clearly established Federal law, as determined by the Supreme Court of the United States,"

as used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta," of Supreme Court

decisions). Circuit precedent simply "may [not] be used to refine or sharpen a general principle of

Supreme Court jurisprudence into a specific legal rule that [the Court] has not announced."

*Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Given the lack of Supreme Court precedent regarding Petitioner's *Miranda* challenge to Stipanuk's testimony, any rejection of this claim by the state courts cannot have been contrary to, or an unreasonable application of, clearly established federal law. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("Given the lack of holdings from this Court [on the issue at hand], it cannot be said that the state court 'unreasonably applied clearly established Federal law.'"). Petitioner, therefore, is not entitled to relief with respect to this portion of ground VII.

With respect to Cervantes, Petitioner argues that the admission of Cervantes' testimony violated the Sixth Amendment because Cervantes was deliberately trying to elicit information from Petitioner and was acting as a state actor.

The Supreme Court has noted that "once a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of his lawyer." *Kuhlmann v. Wilson*, 477 U.S. 436, 457 (1986) (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)), *abrogated by statute on other grounds as noted by Banister v. Davis*, 590 U.S. 504, 514 (2020). The Supreme Court has extended that holding to incriminating statements made by a jailhouse informant. *See generally United States v. Henry*, 447 U.S. 264 (1980). Specifically, the Court held that when a jailhouse informant "deliberately use[s] his position to secure incriminating information from [the defendant] when counsel [is] not present," a Sixth Amendment violation occurs. *See id.* at 270. The *Henry* Court noted that "[c]onversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents." *Id.* at 273.

Opinions applying this clearly established federal law reveal that determining whether an inmate informant deliberately elicits incriminating statements in a way that is attributable to the government, or simply serves as a listener, is a fact-intensive inquiry. *Compare Post v. Bradshaw*,

621 F.3d 406 (6th Cir. 2010) (court determined that the petitioner failed to carry his burden that the inmate informant was anything more than a listener), *with Ayers v. Hudson*, 623 F.3d 301 (6th Cir. 2010) (court determined that inmate informant was more than a listener based on surrounding facts); *see also Muehleman v. Florida*, 484 U.S. 882 (1987) (Marshall, J., in dissent from denial of certiorari, disagreed with majority's implicit conclusion that inmate informant was just a listener); *United States v. Cashin*, Nos. 91-2303, 91-2329, 991 F.2d 796, 1993 WL 106847 (6th Cir. Apr. 9, 1993) (just a listener); *United States v. Moore*, 917 F.2d 215 (6th Cir. 1990) (same); *United States v. Mohammed*, 501 F. App'x 431, 445-46 (6th Cir. 2012) (inmate informant did not deliberately elicit incriminating statements); *United States v. Stewart*, Nos. 91-5174, 91-5177, 951 F.2d 351, 1991 WL 276255 (6th Cir. Dec. 20, 1991) (same); *United States v. Moore*, 240 F. App'x 699 (6th Cir. 2007) (same).

Petitioner suggests that the court of appeals' rejection of his Sixth Amendment argument is unreasonable because, he states, after Cervantes met with an FBI agent "about gathering information to offer as a proffer," "the people had the Ingham County Sheriff's Department move [Cervantes] into the same housing unit as petitioner so he could be closer to him." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.500.) After Cervantes turned over information in August of 2010, "the people then had [P]etitioner moved out of this housing area and had the co-defendant moved in." (*Id.*, PageID.501.) Petitioner argues that the state "provided [Cervantes] with directions to continue to gather additional information from the co-defendant," and that any implication that Cervantes was not a state actor "is ludicrous." (*Id.*, PageID.502.)

Here, however, Petitioner provides no evidence—other than his self-serving statements— to overcome the court of appeals' conclusion that Cervantes was not acting on behalf of the FBI or the Ingham County Prosecutor's Office. Although Petitioner suggests that government agents

were instrumental in having Cervantes moved into Petitioner's housing unit, as well as having

Petitioner's co-defendant placed near Cervantes, Petitioner offers no evidentiary support for that

conclusion. Moreover, during trial, Cervantes testified that his conversations with Petitioner began

with him asking Petitioner why he was in jail, and Petitioner responded that he was "in here for

murder and armed robbery." (Trial Tr. III, ECF No. 10-9, PageID.1227.) Petitioner provided

numerous details about the incident to Cervantes. (*Id.*, PageID.1227–1231.) Cervantes testified

that he never looked at Petitioner's police report while in jail. (*Id.*, PageID.1231.) When asked

why not, Cervantes responded: "He told me that out of pure arrogance, I think, because he talked

about it every day. I wasn't the only person he talked to about that. It was countless people in that

jail that know his case." (*Id.*) In light of the foregoing, the Court cannot agree with Petitioner that

the court of appeals' rejection of his Sixth Amendment challenge to the admission of Cervantes'

testimony is contrary to, or an unreasonable application of, clearly established federal law.

Petitioner, therefore, is not entitled to relief with respect to this portion of ground VII.

In sum, the admission of testimony from both Stipanuk and Cervantes did not violate

clearly established federal law in any way. Petitioner, therefore, is not entitled to relief with respect

to habeas ground VII.

### G.    Ground VIII—Closure of Courtroom

In ground VIII, Petitioner argues that the trial court violated his right to a public trial when

it "failed to consider an alternative to a temporary closure and when it failed to realize that the

courtroom was never fully reopened to the public, being that only the jury pool was allowed to re-

enter." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.504.)

The record reflects that during jury selection on April 11, 2011, one of the potential jurors,

Sajeda Kabeer, indicated that she was not comfortable voicing her concerns about jury service in

front of everyone present. (Trial Tr. I, ECF No. 10-7, PageID.1087.) The trial judge indicated that

Ms. Kabeer would "talk to us" whenever the court took a break. (*Id.*) Shortly thereafter, the trial judge stated:

> All right. At this time I need to address the concern of our one potential juror and she wants to do that outside the presence of all of you so I'm going to ask that you take a few minutes break in the hall and, ma'am, if you could just come back up to the podium and then Mr. Goodrich will let you back as soon as we are ready.

(*Id.*, PageID.1089.) The transcript reflects that the jury panel was excused, and the trial judge then noted, "All right. The record should reflect that we only have counsel and defendant and courtroom staff." (*Id.*) After questioning the potential juror, the trial judge released her for cause. (*Id.*) The transcript reflects that the jury pool was brought back into the courtroom at 10:54 a.m. (*Id.*) The remainder of the first day of trial consisted of finalizing jury selection, preliminary jury instructions, opening statements by the parties, and, after the jury had been excused for the day, arguments by counsel regarding the admissibility of prior statements made by Petitioner.

Petitioner raised his argument regarding the closure in his Rule 6.502 motion, and the trial court rejected it, stating:

> During voir dire, "on its own initiative or on the motion of a party, the court may provide, for a prospective juror or jurors to be questioned outside of the presence of the other jurors." MCR 6.432(C)(2). In this case, the Court asked the panel of jurors if being seated on the jury would pose a hardship. One of the potential jurors indicated she was not comfortable talking in front of the panel. The Court took a break and then questioned her about her hardship. Outside of the presence of the other jurors, the juror expressed she had a language barrier and a possible bias against [the prosecution]. The Court released the juror for cause and specifically noted for the record that this occurred outside the presence of the jury panel. The jury was then brought back into the courtroom and voir dire continued.
>
> [Petitioner] argues this was an unconstitutional closure of the court denying him his Sixth Amendment right to a public trial. The questioning was handled on the record with [Petitioner] present even though it was in a closed setting outside the presence of other jurors or the public. A lone juror was questioned in the closed setting to protect her privacy. All other portions of the trial were available to the jury and the public. This argument lacks merit, as this limited setting was allowed for by the court rules and jury instructions.

*Brown*, 2021 WL 10564394, at *7–8.

The Sixth Amendment provides that a criminal defendant "shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (internal quotation marks and citations omitted). Moreover, "[w]hile the accused does have a right to insist that the *voir dire* of jurors be public, there are exceptions to this general rule." *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam). Notably, the "right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.*

At issue in *Waller* was the court's decision to fully close the courtroom to the public. A full closure refers to a "closure where the entire public, including the media, is excluded from the courtroom." *Drummond v. Houk*, 797 F.3d 400, 402 (6th Cir. 2015). The *Waller* Court set forth a set of explicit rules for a trial court to consider when ruling upon a request to fully close a courtroom. Specifically,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

Petitioner first faults the trial court for failing to follow *Waller*'s instruction to consider reasonable alternatives to closing the proceeding. *Waller*, however, involved a situation where the defendant objected to closure of the courtroom. In *Presley*, the Supreme Court clarified that when

a party objects to closure of the courtroom but does not propose any alternatives, the trial judge must *sua sponte* consider alternatives. *See Presley*, 558 U.S. at 214. Unlike in *Waller*, neither party in Petitioner's case requested closure of the courtroom during the court's questioning of Ms. Kabeer. Instead, the trial court *sua sponte* noted that it would close the courtroom to all but counsel, Petitioner, and court staff during the questioning. Neither party objected to that determination.

The Sixth Circuit addressed a similar situation to the one presented here in *Johnson v. Sherry*, 465 F. App'x 477 (6th Cir. 2012). Johnson argued in his § 2254 petition that his right to a public trial had been violated when the courtroom was temporarily closed during the testimony of three key witnesses. *Id.* at 478. The Sixth Circuit rejected Johnson's claim, stating:

> At the time of its decision, the state court faced two relevant precedents pointing in different directions. *Waller* stated that "the trial court must consider" alternatives, but did not explicitly say that the court must do so even when the defendant consents to closure. (The defendant objected to closure in *Waller*.) Since the time of the state court's decision here, the Supreme Court has clarified that *when a party objects* to closure, but does not propose alternatives, the judge must think of some sua sponte. *See Presley v. Georgia,* —— U.S. ——, ——, 130 S. Ct. 721, 724, 175 L. Ed. 2d 675 (2010). Indeed, *Presley* said that *Waller* was "clear" on this point. *Id.* But the situation here was different. Johnson, through counsel, affirmatively consented to closure and waived his objection in the trial court. And thus a different Supreme Court case arguably controlled. In *Levine v. United States,* 362 U.S. 610, 80 S. Ct. 1038, 4 L.Ed.2d 989 (1960), the trial court adjudicated the defendant's criminal contempt proceeding with a closed courtroom. *See id.* at 618, 80 S. Ct. 1038. The defendant made "no request to open the courtroom[.]" *Id.* Indeed, he raised the public trial claim "only as an afterthought on appeal." *Id.* at 620, 80 S. Ct. 1038. In these circumstances, the Court held, the trial judge need not have opened the courtroom "on his own motion[.]" *Id.* at 619, 80 S. Ct. 1038. Thus, the state court could reasonably think that when a defendant consents and thereby provides no "notice of the claim," the "onus" will not be on the trial court to fulfill all the same requirements that apply when a defendant objects. *Id.*

> One might argue that *Levine* is distinguishable. Notably, the proceeding there was for criminal contempt. That meant that the right to a public trial there derived from due process rather than the Sixth Amendment. *See id.* at 616–17, 80 S. Ct. 1038. But the Court never stated that its forfeiture holding was limited to public trials guaranteed by the Due Process Clause rather than the Sixth Amendment. Moreover, the Court has continued to cite *Levine* even after its decision in *Waller*. *See Peretz v. United States,* 501 U.S. 923, 936, 111 S. Ct. 2661, 115 L. Ed. 2d 808 (1991). But to decide this case we need not decide whether *Waller* or *Levine* governs in a case

72

like this one. It is enough to say that, in light of *Levine*, *Waller* arguably did not require sua sponte consideration here; thus the Michigan Court of Appeals did not unreasonably apply "clearly established" Supreme Court precedent in addressing the third *Waller* prong. *See Railey v. Webb,* 540 F.3d 393, 413–14 (6th Cir.2008).

*Johnson*, 465 F. App'x at 480.

Upon consideration of the foregoing, the Court finds *Johnson* to be entirely on point to Petitioner's situation. Here, Petitioner, through counsel, essentially consented to the trial judge's decision to close the courtroom to question Ms. Kabeer by not objecting to that determination. Because neither party requested the closure, it was entirely reasonable for the state courts to believe that the trial judge did not have to *sua sponte* consider alternatives to the closure. Moreover, Petitioner fails to demonstrate any prejudice from the temporary closure for questioning of Ms. Kabeer. During questioning, Ms. Kabeer indicated that her English is "not good" and that she had "gone through your system." (Trial Tr. I, ECF No. 10-7, PageID.1089.) Specifically, Ms. Kabeer noted that she could be biased against the prosecutor. (*Id.*) Indeed, if Ms. Kabeer had expressed her bias in open court in front of the entire jury pool, Petitioner may not have received a fair trial. *See Waller*, 467 U.S. at 45 (noting that the defendant's right to a fair trial can provide an exception to the general rule of public trials); *see also Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017) (noting that "while the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint"); *cf. DeJonge v. Burton*, No. 18-2339, 2020 WL 2533574, at *4 (6th Cir. Apr. 20, 2020) (concluding that the petitioner's right to a public trial was not violated when the trial court partially closed *voir dire* and "conducted a portion . . . in chambers because some potential jurors may have heard about the case or may have known people involved in the case, and the court did not want the questioning of these potential jurors to contaminate the entire venire").

Petitioner contends further that the closure "ultimately ended up being much broader, 5 ½ hours broader than its original purpose, lasting until the end of business for the court for the day." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.505.) He avers that the record "is [de]void of any suggestion that anyone other than the jurors were allowed back in or whether the public was informed that they could re-enter as the record ONLY INDICATES that 'the jury was brought back into the courtroom.'" (*Id.*, PageID.506.) Petitioner faults the trial court for "fail[ing] to recognize that the courtroom was never fully re-opened to anyone other than the jury pool." (*Id.*, PageID.507.) Petitioner's contention, however, is based only upon his speculative belief. Petitioner offers no evidence, much less clear and convincing evidence, to overcome the trial court's factual determination that "[a]ll other portions of the trial were available to the jury and the public." *Brown*, 2021 WL 10564394, at *8. Petitioner offers nothing from which the Court could infer that any members of the public were present on the first day of trial and were prohibited from re-entering the courtroom after the court's limited questioning of Ms. Kabeer.

In light of the foregoing, Petitioner fails to demonstrate that the trial court's rejection of his claim regarding an alleged violation of his Sixth Amendment right to a public trial is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground VIII.

## H.    Grounds Asserting Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of counsel in grounds IV, IX, XI, XII, and XX. Moreover, Petitioner raises a conflict of interest claim in ground X. Petitioner raised ground IV on direct appeal and his other grounds for relief during post-conviction proceedings.

### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a

74

claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687–88. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith*

*v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential," per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Furthermore, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

As noted above, Petitioner raised several grounds of ineffective assistance on both direct appeal and during post-conviction proceedings. On direct appeal, the court of appeals addressed Petitioner's claims under the following standard:

> In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that "counsel's representation fell below an objective standard of reasonableness," which requires a showing "that counsel's performance was deficient." *Strickland v. Washington,* 466 U.S. 668, 687–688; 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984). A defendant must then demonstrate that "the deficient performance prejudiced the defense," which "requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* at 687. The Court has held that this second prong is asking whether "there was a reasonable probability that the outcome of the trial would have been different had defense

counsel adequately" performed. *People v. Grant,* 470 Mich. 477, 496; 684 N.W.2d 686 (2004).

*Brown*, 2012 WL 3536982, at *9. During post-conviction proceedings, the trial court briefly cited to *Strickland* in its opinion and order partially granting Petitioner's Rule 6.502 motion. *See Brown*, 2021 WL 10564394, at *4. In its opinion regarding the State's appeal from the trial court's grant of post-conviction relief, the court of appeals set forth the following standard:

> "To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v. Uphaus*, 278 Mich. App. 174, 185; 748 N.W.2d 899 (2008). "[T]he test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel." *Id.* at 186.

*Brown*, 2023 WL 2051898, at *3.

Clearly, there is no question that the state courts applied the correct standard. This eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. Therefore, because the court of appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the determinations regarding ineffective assistance of counsel are unreasonable applications of *Strickland* or if the resolutions were based on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).

## 2.    Ground IV—Ineffective Assistance of Trial Counsel

As his fourth ground for relief, Petitioner takes issue with the court of appeals' decisions regarding the ineffective assistance of counsel claims he raised in his *pro per* supplemental brief on direct appeal. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.483.) Petitioner raises five separate claims of ineffective assistance of trial counsel within this ground for relief. The Court considers each in turn below.

### a.    Failure to Investigate and Interview Witnesses

Petitioner first faults trial counsel for failing to investigate and interview witnesses.
Petitioner contends that counsel should have obtained cell phone records that would have shown
that Petitioner was "some 25 miles away from the crime scene for 4 hours before and 14 hours
after the time of death window as pronounced by the ME." (*Id.*, PageID.483.) Petitioner avers
further that a mechanic and his girlfriend could have testified that Petitioner was working on his
truck at the time of the incident. (*Id.*) Petitioner also notes that he provided the names of several
prostitutes to counsel, and that those individuals could have "established the decedent's recent
drug binge and would have detailed the thousands of dollars he had spent 10 days before death."
(*Id.*, PageID.483–484.) Petitioner notes further that medical records would have shown "the
extensive damage that was done to the petitioner's ankle some 75 days earlier," and that the
orthopedic surgeon would have testified that Petitioner was unable "to physically subdue, without
any weapon, the victim, who was 6' tall and around 180 pounds." (*Id.*, PageID.484.) Finally,
Petitioner suggests that counsel should have obtained "parts purchase and warranty records from
the Auto Zone" where Petitioner purchased parts for his truck because those records would have
shown that Petitioner "was out of town during the time of death." (*Id.*)

The court of appeals rejected Petitioner's arguments on direct appeal, stating:

[Petitioner] challenges that defense counsel failed to investigate and discover
significant evidence such as exculpatory witnesses and phone records. "However,
[d]ecisions regarding what evidence to present and whether to call or question
witnesses are presumed to be matters of trial strategy, which we will not second-
guess with the benefit of hindsight." *People v. Dixon,* 263 Mich. App. 393, 398;
688 N.W.2d 308 (2004) (internal quotations and citations omitted). Moreover,
despite [Petitioner's] claims on appeal, the record is silent with regard to the
investigation defense counsel completed, although he did secure funds to hire an
investigator. As our review is limited to mistakes apparent on the record, *Cox,* 268
Mich. App. at 453, [Petitioner] has failed to demonstrate that defense counsel's
behavior was objectively unreasonable.

Additionally, "[i]t must be shown that the failure resulted in counsel's ignorance of valuable evidence which would have substantially benefited the accused." *People v. Caballero,* 184 Mich. App 636, 642; 459 N.W.2d 80 (1990). There is no indication in the lower court record that these witnesses would have testified favorably for [Petitioner] or that evidence, such as phone records, was actually exculpatory. Additionally, considering the significant evidence presented at trial of [Petitioner's] guilt, there is not a reasonable probability that any failure to present this evidence affected the outcome of the trial. *See Strickland,* 466 U.S. at 688.

*Brown*, 2012 WL 3536982, at *9.

The court of appeals' conclusion is entirely consistent with *Strickland*. With respect to Petitioner's contention that counsel should have called numerous witnesses to testify on his behalf, Petitioner offers nothing but his own speculation that testimony from these witnesses would have changed the outcome of his trial. Petitioner's speculation is simply not sufficient to maintain his claim, particularly in light of the overwhelming evidence against him. *See Tinsley v. Million,* 399 F.3d 796, 810 (6th Cir. 2005) (affirming denial of an ineffective assistance claim based on counsel's failure to call witnesses where a petitioner did not "introduce [ ] affidavits or any other evidence establishing what they would have said"); *United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir. 1991) ("[T]he testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit; [a] defendant cannot simply state that the testimony would have been favorable, [as] self-serving speculation will not sustain an ineffective assistance claim.") (footnote omitted); *see also United States v. Tilghman*, No. 07-cr-138-KSF, 2013 WL 4735578, at *10 (E.D. Ky. Sept. 3, 2013) (noting that "[w]hen a defendant claims that his attorney failed to call a witness at trial, he must '[a]t the very least . . . submit sworn affidavits from each of the individuals he has identified as uncalled witnesses stating whether they were in fact available to appear at trial and able to give testimony favorable to [the] defense'" (quoting *Talley v. United States*, No. 1:00-cv-74, 2006 WL 3422997, at *10 (E.D. Tenn. Nov. 27, 2006))).

Likewise, Petitioner's assertions that counsel should have obtained and presented numerous documents such as medical records, Auto Zone purchase receipts, and cell phone records are based only upon Petitioner's speculation that these records would have altered the outcome of his trial. Given the evidence presented against Petitioner, he fails to describe how these records would have altered the outcome. Accordingly, for the foregoing reasons, Petitioner has not demonstrated that the court of appeals' rejection of this assertion of ineffective assistance of trial counsel is contrary to, or an unreasonable application of, *Strickland*.

### b. Failure to Interview or Call Alibi Witnesses or File Notice of Alibi

Next, Petitioner faults trial counsel for failing to file a notice of alibi. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.485.) Petitioner suggests that the putative witnesses discussed above would have provided him with an alibi defense. (*Id.*) For the same reasons set forth above, Petitioner is not entitled to relief with respect to this assertion of ineffective assistance of trial counsel.

### c. Failure to Interview or Present Testimony from Co-Defendant

Petitioner also avers that counsel should have called co-defendant Jason Morse to testify on Petitioner's behalf at trial. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.485.) According to Petitioner, Morse would have "offered testimony that the petitioner was indeed out of town during the time of death as he delivered drugs to the petitioner while he was working on his truck some 25 miles away." (*Id.*, PageID.486.) Petitioner acknowledges, however, that Morse may have chosen to invoke his Fifth Amendment right against self-incrimination had he been called to testify. (*Id.*, PageID.485.)

Petitioner's assertion is solely based upon his own speculation. Had counsel called Morse as a witness, and Morse chose to invoke his Fifth Amendment right, Morse would not have

provided any helpful testimony for Petitioner's defense. Notably, Petitioner does not provide any evidence that Morse was available and willing to testify at Petitioner's trial. For these reasons, Petitioner is not entitled to relief with respect to this assertion of ineffective assistance.

### d.    Failure to Provide DVD Recordings

Next, Petitioner argues that counsel failed to provide him with DVD recordings from government witnesses so that Petitioner could help prepare his defense. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.486.) Specifically, Petitioner contends that "the numerous DVDs that the Lansing Police made of [Petitioner], the star witness[,] and the jailhouse snitch were never shown to [him] prior to trial." (*Id.*) According to Petitioner, if he had been able to view the recordings, he could have "been active in presenting a defense," particularly because, Petitioner argues, these witnesses' original statements "differed greatly from the testimony at trial." (*Id.*)

The court of appeals rejected Petitioner's argument, stating:

Next, [Petitioner] argues that he was denied the effective assistance of counsel when his counsel refused to provide him with the video recordings of police interviews. There is no evidence in the lower court that counsel actually prevented defendant from viewing these video recordings. Further, even if counsel did behave in this manner, [Petitioner] has failed to demonstrate that the outcome of the proceedings would be different but for counsel's errors. Particularly in regard to [Petitioner's] statements to the police, defense counsel repeatedly attempted to suppress this evidence, and nothing indicates that [Petitioner's] independent review of the video recordings would have affected the result of either the suppression hearing or the trial.

*Brown*, 2012 WL 3536982, at *10.

Upon review of the record, the court of appeals accurately noted that Petitioner's counsel attempted on numerous occasions to have Petitioner's statements to the police suppressed. Petitioner fails to explain how his own review of the recordings of his statements would have led to a different outcome. Likewise, the record reflects that counsel thoroughly cross-examined both Stipanuk (the "star witness") and Cervantes (the "jailhouse snitch"). Petitioner fails to explain how

81

any further review of the recordings of their statements would have added to counsel's cross-examination of these witnesses. Moreover, by convicting Petitioner, the jury chose to believe the prosecution's witnesses over Petitioner's defense, and Petitioner fails to demonstrate that any further review of the recordings in question would have altered that decision. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of counsel.

### e.        Failure to Object to Prosecutorial Misconduct

Petitioner next contends that trial counsel erred by not objecting to instances of prosecutorial misconduct. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.487.) He argues that counsel should have objected to the prosecutor vouching for witnesses, as well as the prosecutor's misstatements of the evidence. (*Id.*) The court of appeals summarily rejected this claim, stating:

> [Petitioner] also asserts that failing to object to instances of prosecutorial misconduct constituted ineffective assistance of counsel. However, the prosecution's comments were proper. "Because the comments were proper, any objection to the prosecutor's arguments would have been futile [and][c]ounsel is not ineffective for failing to make a futile objection." *Thomas,* 260 Mich. App at 457. Moreover, even if the prosecution's comments were improper, the jury was instructed that the statements were not evidence, and juries are presumed to follow [their] instructions. *See Meissner,* 294 Mich. App. at 457. Thus, there is no evidence that any objections would have affected the outcome of the trial. *See Strickland,* 466 U.S. at 688.

*Brown*, 2012 WL 3536982, at *10. This conclusion is entirely consistent with *Strickland*. As discussed above, this Court has determined that Petitioner's claims of prosecutorial misconduct lack merit. The Court, therefore, cannot agree with Petitioner that counsel's failure to object to any alleged prosecutorial misconduct prejudiced his defense in any way. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."); *see also Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (noting that "omitting meritless arguments is neither professionally unreasonable nor prejudicial"). Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of trial counsel.

In sum, the court of appeals' conclusions regarding Petitioner's various claims of ineffective assistance of trial counsel are neither contrary to nor an unreasonable application of *Strickland*. Petitioner, therefore, is not entitled to relief with respect to ground IV.[3]

### 3.    Ground IX—Trial Counsel Failed to Prepare and Prevented Petitioner from Testifying

As his ninth ground for relief, Petitioner contends that the trial court erred when it rejected his assertion that counsel was ineffective for failing to prepare Petitioner to testify on his own behalf and for effectively preventing Petitioner from testifying at trial. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.507.) Petitioner argues that "during the dozens of meetings trial counsel had with him prior to trial, counsel always thought it a good idea for the petitioner to testify." (*Id.*) According to Petitioner, counsel told him "every day of trial that he would be testifying, until the last day, when counsel ultimately told him that they had not had enough time to prepare and he would not allow petitioner to testify blindly." (*Id.*)

In its opinion and order addressing Petitioner's Rule 6.502 motion, the trial court rejected this claim of ineffective assistance, stating:

---

[3] On direct appeal, Petitioner raised an assertion that "counsel's cumulative errors denied him the effective assistance of counsel," and the court of appeals rejected that assertion because no errors had occurred. *See Brown*, 2012 WL 3536982, at *10. In his federal habeas petition, Petitioner acknowledges that "cumulative effect claims are not cognizable on habeas review." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.488.) However, the Court must consider the cumulative effect of such errors because "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)). "Thus, examining an ineffective assistance claim requires the Court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)). However, as discussed above, the Court has concluded that Petitioner has failed to demonstrate that counsel was constitutionally deficient in any way. Thus, because Petitioner's individual claims of ineffective assistance lack merit, he cannot show that any alleged cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

[Petitioner] argues his Fifth Amendment right was violated when he was not prepared to testify by his trial counsel, nor did he testify at trial. A defendant's decision to testify is a strategic decision best left to Defendant and his counsel. *People v. Martin*, 150 Mich. App. 630, 640 (1986). There is no requirement in Michigan that there be an on-the-record waiver of a defendant's right to testify. *People v. Simmons*, 140 Mich. App. 681, 684 (1985); *People v. Harris*, 190 Mich. App. 652 (1991). If a defendant states on the record a desire to testify and is prevented from doing so, a conviction may be reversed. *Simmons*, 140 Mich. App. at 685. If a defendant decides not to testify or acquiesces in his attorney's decision that he not testify, the right to testify is deemed waived. *Id*. at 684-85. When a defendant waives his right to testify, any error is distinguished. *People v. Carter*, 462 Mich. 206, 219–20 (2000).

In this case, [Petitioner] never spoke on the record as to his desire to testify. However, [Petitioner] asserts he expressed the desire to testify to the trial attorney, who did not prepare him or call him to the [stand]. There was no opportunity or method of addressing the court directly because [Petitioner] was reliant on trial counsel to do so, but counsel chose not to allow him to testify. Michigan does not require a waiver of the right to testify by a defendant to be placed on the record. At trial, there was no inquiry by the Court as to whether [Petitioner] would take the stand on his own behalf. However, [Petitioner's] acquiescence to his trial counsel's decision waived the right to have the issue reviewed, as it extinguished any error; therefore, this claim has no merit.

*Brown*, 2021 WL 10564394, at *8.

In a criminal trial, the protections afforded under the Constitution for "due process of law" provide that "no one shall be condemned in his person . . . without an opportunity of being heard in his own defense." *Holden v. Hardy*, 169 U.S. 366, 390–91 (1898). A criminal defendant's right to testify on his own behalf "is a fundamental right." *United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007) (citing *Rock v. Arkansas*, 483 U.S. 44, 52–53 & n.10 (1987)). The right can be waived by a defendant only if done so knowingly and intelligently. *Id.* (citation omitted); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973) ("Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial."). The Supreme Court has determined that some waivers of fundamental rights are required to be taken on the record. However, while it remains advisable, "the trial court is neither required to sua sponte address a

silent defendant and inquire whether the defendant knowingly and intelligently waived the right to testify, nor ensure that the defendant has waived the right on the record." *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)). To retain the right, "a defendant must 'alert the trial court' that he desires to testify" or that a disagreement with defense counsel exists. *Id.* (quoting *Pelzer v. United States*, No. 96-1195, 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997)).

Here, the trial court's determination turned principally on the resolution of factual issues, not legal issues. As noted above, a determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis*, 658 F.3d at 531. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner*, 449 U.S. at 546–547 (1981); *Smith*, 888 F.2d at 407 n.4. Here, Petitioner does not offer any new evidence to rebut the state court's findings. Instead, he suggests that it was "ludicrous" for the trial court to claim that it "expected the petitioner to directly address the court about his insistence on testifying" despite the fact that the court "instructed the petitioner that he could not speak directly to the court, he could not interrupt counsel or the people[,] and he could only speak to and through his attorney." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.508.)

Despite Petitioner's assertions, the trial court's conclusion is entirely consistent with clearly established federal law. The record reflects that during jury selection, when Petitioner's counsel indicated the names of the witnesses he intended to call on behalf of Petitioner's defense, counsel did not mention Petitioner as a potential witness. (Trial Tr. I, ECF No. 10-7, PageID.1086.) Petitioner fails to provide any evidence to suggest that he tried to alert counsel at that time that he might wish to testify. Similarly, when Petitioner's counsel rested after presenting defense

witnesses, there is no indication that Petitioner tried to alert either counsel or the court at that time that he wished to testify. (Trial Tr. IV, ECF No. 10-9, PageID.1262.) Furthermore, the record is notably devoid of any offer of proof outlining Petitioner's purported testimony. Thus, there is nothing in the record to support a claim that Petitioner's failure to testify resulted in any prejudice to him.

Petitioner fails to demonstrate that the trial court's rejection of his ineffective assistance claim premised upon counsel's failure to call him to the stand to testify on his own behalf is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground IX.

### 4.    Ground X—Conflict of Interest

Next, Petitioner contends that the trial court's decision regarding his "conflict of interest issue lacks alignment with clearly established federal law and lacks specificity with regards to its factual findings." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.509.) Petitioner argues that a conflict of interest existed because Petitioner's counsel and his wife had a "social relationship" with "jailhouse snitch" Cervantes' "sister and her husband." (*Id.*, PageID.510.) Petitioner states further that "trial counsel would pass messages back and forth between Cervantes' family and Cervantes and counsel[] on several occasions sent several verbal messages with [P]etitioner to give to Cervantes." (*Id.*) Petitioner also mentions that he passed a handwritten note from counsel to Cervantes in which counsel "agreed to represent Cervantes to the feds to force them to pick up his charges." (*Id.*) Petitioner contends that this conflict of interest adversely affected counsel's performance because counsel did not effectively cross-examine Cervantes at trial and failed to call other inmates to testify about Cervantes' "daily activities with the co-defendant." (*Id.*, PageID.510–511.)

The trial court rejected Petitioner's conflict of interest argument, stating:

[Petitioner] argues his Sixth Amendment right was violated when his trial counsel had a conflict of interest in that he had personal connections to the witness who was incarcerated at the same time, Antonio Cervantes, Jr. One form of actual ineffectiveness claim warrants a presumption of prejudice. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). In *Cuyler v. Sullivan*, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest 446 U.S. 335, 345–50 (1980). In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. *Strickland*, 466 U.S. at 692. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. *Id.*

While [Petitioner] makes several allegations as to this conflicting relationship, there is little evidence on the record to support it. [Petitioner] claims he would pass his trial counsel notes from Mr. Cervantes, that he informed counsel that Mr. Cervantes told [Petitioner] his family attended church with Defendant's trial counsel's sister and her husband, and that [Petitioner's] trial counsel may have visited Mr. Cervantes in jail. He also alleges to have a witness who would testify as to Mr. Cervantes' willingness to testify against [Petitioner] so he could, get a deal with federal prosecutors. However, [Petitioner] has failed to offer any substantive proof that there was an actual conflict of interest or even an inappropriate relationship between his defense counsel and Mr. Cervantes. In actuality, [Petitioner's] trial counsel elicited information on cross-examination that Mr. Cervantes talked to Mr. Morse about the case, and about how he collected this information to benefit his case, thereby discrediting the witness. Ultimately, there is little evidence to this argument, and thus it lacks merit[.]

*Brown*, 2021 WL 10564394, at *9.

For purposes of an ineffective assistance of counsel claim, prejudice is presumed if counsel is shown to have been burdened by an actual conflict of interest. *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)). However, even in the case of such a conflict of interest, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 350). The United States Court of Appeals for the Sixth Circuit has set forth the showing necessary to establish such a conflict:

To find an actual conflict, we require petitioner to "point to specific instances in the record to suggest an actual conflict or impairment of [his] interests" and "demonstrate that the attorney made a choice between possible alternative courses of action" . . . . Counsel's choices between alternative courses is evidence of

87

adverse effect only if it is not part of a legitimate strategy, "judged under the deferential review of counsel's performance prescribed in *Strickland*."

*McElrath v. Simpson*, 595 F.3d 624, 624–25 (6th Cir. 2010) (citations omitted).

Petitioner has not—and cannot—make the requisite showing of an actual conflict as set forth in *McElrath*. Instead, Petitioner merely reiterates the arguments that he raised in his Rule 6.502 motion—arguments that have already been rejected by the trial court. Moreover, the trial court correctly pointed out that Petitioner's counsel thoroughly cross-examined Cervantes about the fact that Cervantes had talked about the case with Petitioner's co-defendant, Jason Morse. (Trial Tr. III, ECF No. 10-9, PageID.1232–1233.) Although Petitioner reiterates his assertions that counsel had a social relationship with Cervantes' family and passed notes to Cervantes through Petitioner, Petitioner fails to challenge the trial court's rejection of those assertions by providing evidence to support his claims. Petitioner has provided nothing from which this Court could conclude that counsel labored under an actual conflict of interest that adversely affected counsel's performance. Accordingly, Petitioner is not entitled to relief with respect to ground X.

### 5.    Ground XI—Trial Counsel's Failure to Object to Closure of Courtroom

In ground XI, Petitioner faults the trial court for not ruling on his claim that trial counsel was ineffective "for failing to object to the initial closure of the courtroom and when he failed to notice that the closure lasted all day." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.511.) Petitioner argues that "when the actual issue of the courtroom closure is properly evaluated by this Court, then it will also rule that counsel was ineffective for not objecting to or noticing the closure that lasted throughout the day." (*Id.*)

As an initial matter, contrary to Petitioner's assertion, the trial court did rule upon this ground for relief, stating:

> [Petitioner] argues his rights were violated when his counsel f[a]iled to object to the closure of the courtroom. However, as explained above, the court acted within its discretion to take a break, and no evidence that suggests the public was prevented from being present during opening statements, additional voir dire, or trial. Thus, this argument lacks merit.

*Brown*, 2021 WL 10564394, at *10.

The Supreme Court has held that "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically." *Weaver*, 582 U.S. at 300–301. Instead, the defendant has the burden "to show either a reasonable probability of a different outcome in his or her case, or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.* Here, Petitioner fails to meet that burden. As discussed above, the Court has already concluded that the trial court's decision to temporarily close the courtroom to question Ms. Kabeer during *voir dire* did not render Petitioner's trial fundamentally unfair. Nor does Petitioner present any evidence suggesting that his trial would have resulted in a different outcome had counsel objected to the temporary closure. The trial court's rejection of this claim of ineffective assistance is entirely consistent with clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to ground XI.

### 6.    Ground XII—Failure to Investigate Stipanuk's Mental Health

In ground XII, Petitioner contends that counsel was ineffective for failing to investigate Stipanuk's mental health. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.512.) Petitioner contends that when Stipanuk testified about his drug abuse and mental health history, he "opened the door to investigate his mental health treatment records." (*Id.*) According to Petitioner, Stipanuk offered expert-like testimony when he noted that both of his parents were doctors and testified about how crack cocaine affected him mentally. (*Id.*) Petitioner believes that counsel should have sought an expert witness to testify regarding Stipanuk's memory and credibility if Stipanuk had

been withdrawing from prescribed psychotropic medication while ingesting crack and drinking alcohol during the time of the incident. (*Id.*, PageID.512–513.)

> The trial court rejected Petitioner's assertion of ineffective assistance, stating:

> [Petitioner] claims there is precedent that states failure to investigate mental health history constitutes deficient performance;[] however, the case [Petitioner] cites does not state such a proposition. *Se[e] generally*[] *People v. Kowalski*, 492 Mich. 106 (2012). In this case, [Petitioner] made no such request for Mr. Stipanuk's medical records at trial, and [Petitioner] offers no binding legal authority that would have permitted his counsel to review such records. While [Petitioner] cites *U.S. v. Gutman*, stating that, "if . . . the ordering of such examinations is limited to narrowly defined circumstances . . . the witness's privacy interests (including the possible problems of harassment) are outweighed by the need for relevant psychiatric evidence," this claim comes from the dissenting opinion of the case, which is not binding on the court. 725 F.2d 417,429 (Coffey, J., dissenting).

*Brown*, 2021 WL 10564394, at *10.

First, with respect to Petitioner's contention that counsel should have called an expert witness to counter Stipanuk's testimony, the Supreme Court has recognized that "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after a thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690). Here, there is no record evidence suggesting that Petitioner's counsel did not investigate the possibility of obtaining expert testimony regarding the effects of drug abuse and withdrawal from psychotropic medication on memory. Absent such support, Petitioner cannot overcome the presumption that counsel's actions fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Furthermore, Petitioner fails to offer support for his assertion that an expert existed who was willing to testify and whose testimony would have been favorable to Petitioner's defense. Without some record support for Petitioner's contention, it is impossible for Petitioner to show that his counsel was professionally unreasonable for failing to pursue such expert testimony or that it made any difference in the result. "A defendant cannot simply state that the testimony would

have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Ashimi*, 932 F.2d at 650 (footnote omitted); *see also Lagrone v. Parris*, No. 23-5177, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) ("Lagrone did not identify an expert his trial counsel could have called or indicate what an expert could have testified that would have been relevant to his defense. The speculative impact of expert testimony is not enough to prove prejudice under *Strickland*."); *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (stating that "[t]he salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").

In any event, as discussed above, Petitioner's counsel thoroughly cross-examined Stipanuk regarding his drug usage and any effects it may have had on his memory of the incident and what he told to law enforcement. Given that fact, Petitioner has not demonstrated that any expert testimony or admission of Stipanuk's mental health records would have changed the result of his trial in any way. Because Petitioner has not demonstrated that the trial court's conclusion was contrary to, or an unreasonable application of, *Strickland*, he is not entitled to relief with respect to habeas ground XII.

### 7.    Ground XX—Ineffective Assistance of Appellate Counsel

As his twentieth ground for relief, Petitioner contends that the court of appeals' rejection of his "ineffective assistance of counsel argument is incomplete, lacks a reasonable application of facts of the case[,] and is in conflict with known federal law and lastly only addresses the three of the four sub-grounds as raised" by Petitioner in his Rule 6.502 motion. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.535.)

The Michigan Court of Appeals rejected the claims of ineffective assistance of counsel Petitioner raised in his Rule 6.500 motion, stating:

[Petitioner's] motion for relief from judgment further claimed that: (1) prior appellate counsel was ineffective for failing to move for a *Ginther*[] hearing; (2) prior appellate counsel was ineffective for failing to file a reply brief in the earlier appeal; and (3) prior appellate counsel was ineffective for failing to timely file its brief on appeal, resulting in a waiver of oral argument. The trial court erred when it partially relied on these arguments in granting the motion for relief from judgment.

A defendant must show both good cause *and* actual prejudice if he could have raised an issue in an earlier appeal but did not. MCR 6.508(D)(3). [Petitioner] claimed these prongs were satisfied because appellate counsel was ineffective. In this case, we need not resolve whether these alleged failings by appellate counsel amounted to ineffective assistance of counsel because [Petitioner] failed to establish actual prejudice. Actual prejudice means that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(*i*)(A). [Petitioner] does not explain in his motion for relief from judgment how he would have had a reasonable chance of acquittal had prior appellate counsel taken the steps [Petitioner] alleges they failed to take. Although appellate counsel's actions caused [Petitioner] to lose out on some opportunities for argument, it does not follow that [Petitioner] was completely deprived of presenting his case. Indeed, appellate counsel filed a brief on appeal and [Petitioner] filed a Standard 4 brief. The trial court did not recognize [Petitioner's] failure to present a prejudice argument, did not address the actual prejudice prong in its ruling, and therefore abused its discretion in granting [Petitioner's] motion for a new trial.

*Brown*, 2023 WL 2051898, at *7 (footnote omitted). The Court considers Petitioner's four sub-grounds for relief below.

### a.     Failure to Preserve Issues in Trial Court Prior to Direct Appeal

Petitioner first suggests that appellate counsel failed to preserve issues in the trial court prior to Petitioner's direct appeal. (*Id.*) According to Petitioner, appellate counsel told him that she did not want to raise any ineffective assistance of trial counsel claims because "trial counsel was cooperating with her and she didn't want to tarnish the relationship." (*Id.*) Petitioner contends that appellate counsel failed to heed his request to file a motion for a new trial raising ineffective assistance of trial counsel prior to proceeding on the direct appeal. (*Id.*) Petitioner argues that the Michigan Court of Appeals failed to analyze this issue. (*Id.*)

Although it appears that the court of appeals addressed this matter as an argument that appellate counsel should have moved for a *Ginther* hearing to establish a record for claims of ineffective assistance of counsel, Petitioner fails to demonstrate any prejudice from appellate counsel's failure to preserve issues. First, as the court of appeals correctly noted, Petitioner was able to file a detailed *pro per* supplemental brief (Standard 4 brief) during his direct appeal. Moreover, to the extent that Petitioner believes counsel failed to raise any of the ineffective assistance of trial counsel claims he now raises in these federal habeas proceedings, as thoroughly discussed above, Petitioner's underlying arguments lack merit. Accordingly, "appellate counsel's failure to raise [any of those claims] on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Thus, Petitioner is not entitled to relief with respect to this assertion of ineffective assistance of appellate counsel.

### b.    Failure to Raise Issues Has Created a Significant Procedural Hurdle

Next, Petitioner suggests that appellate counsel's failure to raise certain issues has cause him to "now face a significant procedural hurdle in establishing 'good cause' for all issues raised herein." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.536 (capitalization corrected).) Petitioner faults the court of appeals for failing to analyze this issue "in any meaningful way." (*Id.*)

As noted above in footnote 1, Respondent contends that some of Petitioner's grounds for relief are procedurally defaulted. However, this Court has concluded that judicial economy favored proceeding directly to a discussion of the merits of Petitioner's grounds for relief. That conclusion alone forecloses Petitioner's suggestion that appellate counsel was ineffective. Moreover, even if

appellate counsel had raised the issues that Petitioner suggests should have been raised, he only speculates that the outcome of his direct appeal or his state post-conviction proceedings would have been different. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of appellate counsel.

### c.    Failure to File Reply Brief

Next, Petitioner faults appellate counsel for not filing a reply brief despite Petitioner's numerous concerns "about the factual inaccuracies and just plain mistruths in the [P]eople's brief." (*Id.*, PageID.537.) Petitioner does not present any persuasive argument to overcome the court of appeals' conclusion that Petitioner was not prejudiced by appellate counsel's failure to file a reply brief. Petitioner provides no evidence to suggest that the outcome of his direct appeal would have differed had counsel filed a reply brief on his behalf. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of appellate counsel.

### d.    Loss of Oral Argument Opportunity

Finally, Petitioner contends that appellate counsel was ineffective by filing the opening appellate brief late, which later led to the Michigan Court of Appeals denying Petitioner's motion to restore oral arguments. (*Id.*, PageID.538.) Petitioner believes that "oral arguments were required in this matter due to the complexity of the issues presented." (*Id.*) He acknowledges that counsel "was allowed to answer two brief questions from the judges, [but that] this lacked in comparison with being allowed to . . . speak for 30 minutes." (*Id.*) Again, Petitioner presents no persuasive argument to overcome the court of appeals' conclusion that Petitioner was not prejudiced by the lack of oral arguments. Petitioner's speculation that the outcome of his appeal may have differed had oral arguments been conducted is insufficient to establish either deficient performance or prejudice. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of appellate counsel.

In sum, the court of appeals' rejection of Petitioner's ineffective assistance of appellate counsel claims is neither contrary to, nor an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground XX.

## I.        Grounds Raising *Brady* Violations

Petitioner asserts three grounds for relief implicating *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three components to finding a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice (and materiality) is established by a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A reasonable probability equates to a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

### 1.        Ground XIII—Withholding of Star Witness's Benefits for Testifying

In ground XIII, Petitioner contends that the State violated *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to disclose its "star witness's benefits for testifying." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.514.) Petitioner claims that when Stipanuk was arrested, he "had an active arrest warrant with a $2,000 cash bond for failure to appear on a driving while suspended charge . . . out of the 54-A District Court." (*Id.*, PageID.514.) Petitioner states that the warrant was dismissed 7 minutes before Petitioner's preliminary examination started. (*Id.*)

95

According to Petitioner, the State claimed that Stipanuk pleaded to other charges, but Petitioner contends that this is false because Stipanuk had no other pending charges in the 54-A District Court "or under the purveyance of the City Prosecutor at that point." (*Id.*) Petitioner contends that "[a] drug addict with an expensive habit who couldn't afford to resolve a 10 month old warrant would definitely have his credibility affected had the jury known about this financial benefit that he received for testifying." (*Id.*, PageID.516.)

> The trial court rejected Petitioner's argument, stating:
>
> According to the Register of Actions, the bench warrant for Mr. Stipanuk was canceled on June 3, 2010, at approximately 10:44 am, because he pleaded to another charge. Assuming it was consistent with his testimony in the preliminary examination, the bench warrant would have been canceled because Mr. Stipanuk was no longer wanted, as he was in court. However, Mr. Stipanuk's case was handled by the City of Lansing, as opposed to the County of Ingham. Because the incident was handled by a different municipal government, [Petitioner] failed to establish the evidence was suppressed by the prosecution. Furthermore, [Petitioner] has failed to show the information was material because it would have led to a different outcome. As such, this claim is without merit.

*Brown*, 2021 WL 10564394, at *11.

In *Giglio*, the Supreme Court extended *Brady* to encompass "evidence of any understanding or agreement as to a future prosecution" against a government witness. *See Giglio*, 405 U.S. at 155. As the *Giglio* Court noted, such evidence goes towards the witness's credibility. *See id.* at 154. Here, Petitioner attached a copy of the Register of Actions to his initial § 2254 petition. (ECF No. 1-29.) A review of that document indicates that the trial court correctly noted that Stipanuk's outstanding warrant was quashed on June 3, 2010. (*Id.*, PageID.430.) The Register of Actions notes that on June 4, 2010, Stipanuk pleaded to another charge, and fines and costs were imposed. (*Id.*)

As an initial matter, Petitioner has still failed to present any evidence suggesting that the warrant was dismissed in exchange for Stipanuk agreeing to testify against Petitioner. Moreover,

the trial court correctly noted that Petitioner has failed to show that this information would have led to a different outcome at trial. The record reflects that Petitioner's counsel thoroughly cross-examined Stipanuk regarding his drug usage and how he was under the influence of crack cocaine on the day of the incident. Counsel's cross-examination questions were worded in a way to suggest to the jury that Stipanuk could not clearly remember what he had been told by Petitioner because of his drug usage. Clearly, by convicting Petitioner, the jury chose to believe Stipanuk and the other prosecution witnesses. Petitioner fails to demonstrate that the jury would have acquitted him had counsel impeached Stipanuk with the information concerning the dismissed warrant.

Because Petitioner has failed to demonstrate that the trial court's rejection of this *Brady* claim is contrary to, or an unreasonable application of, *Brady* and *Giglio*, Petitioner is not entitled to relief with respect to ground XIII.

### 2.    Ground XIV—Withholding of Victim's DNA

Next, Petitioner suggests that the State violated *Brady* by withholding the victim's DNA from the Michigan State Police's forensics lab. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.516.) Specifically, Petitioner contends that "there were several sources of DNA that were taken from the crime scene that were only tested against the petitioner and his co-defendant." (*Id.*, PageID.517.) According to Petitioner, the forensics lab technician testified that she requested that lead detective, Detective Gill, provide her with a sample of the victim's DNA for testing, to no avail. (*Id.*) Petitioner avers that if the MSP lab had the victim's DNA, "it could have been compared to the DNA on the cigarette butts and the few blood samples taken from the hallway." (*Id.*)

In its opinion addressing Petitioner's Rule 6.502 motion, the trial court rejected Petitioner's argument, stating:

> [Petitioner] argues the prosecution did not submit a known DNA sample of the victim to compare to a found cigarette. However, "when police fail to run any tests, the lack of evidence will tend to injure their case more than the defendant's since

the prosecution has the burden of proving guilt beyond a reasonable doubt." *People v. Stephens*, 58 Mich. App. 701, 705-06 (1975). The lack of the confirmed DNA tests on the cigarette does not harm [Petitioner's] case, but rather shows these cigarettes did not belong to him. As testimony at trial excluded the cigarettes as belonging to [Petitioner], his argument lacks merit.

*Brown*, 2021 WL 10564394, at *13.

Petitioner fails to demonstrate that the trial court's rejection of his claim is contrary to, or an unreasonable application of, *Brady*. Notably, Petitioner fails to explain, and the Court fails to discern, how any comparison of the victim's DNA to the cigarette butts and blood was exculpatory. Certainly, further testing may have shown that the victim's DNA was not found on the cigarette butts and blood. Had that been the case, the testing would not have shown the source of the DNA. Moreover, it is entirely likely that further testing would have confirmed a match to the victim's DNA. Petitioner simply speculates that further testing would have provided exculpatory evidence. His speculations are insufficient to demonstrate a reasonable probability that further testing would have resulted in a different outcome at trial, particularly in light of the testimony given against him. For these reasons, Petitioner is not entitled to relief with respect to habeas ground XIV.

### 3.    Ground XV—Withholding of In-Car Recording of Stipanuk

In ground XV, Petitioner contends that the State violated *Brady* by failing to disclose "an in-car recording of their star witness, Stipanuk." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.518.) According to Petitioner, when Stipanuk was first placed in the squad car, he "made a frantic plea with the officer to not arrest him on his warrant and offered he had information about a murder." (*Id.*) Petitioner states that this "entire colloquy was recorded by the in-car camera and was logged into evidence at the Lansing Police Department." (*Id.*) According to Petitioner, this video could have provided "possible impeachment evidence . . ., including showing Stipanuk's physical body language and factual expressions" to raise doubt about his truthfulness. (*Id.*) Petitioner suggests that the video would have shown that Stipanuk was delusional at the time. (*Id.*)

The trial court rejected Petitioner's argument, stating:

> [Petitioner] argues the prosecutor failed to disclose a copy of the in-car camera of Officer Ryan Wilcox. As stated above, the three-part *Brady* analysis requires (1) the evidence at issue must be favorable to the accused, either because it was exculpatory or because it is impeaching evidence, (2) that evidence must have been suppressed by the state, and (3) prejudice must have ensued. *Strickler*, 527 U.S. at 281–82. Defendant claims Mr. Stipanuk frantically made a plea with the police in order to not be arrested. However, Mr. Stipanuk testified he immediately made police aware of his arrest warrant so they would arrest him. In place of the video evidence, [Petitioner] had the opportunity to call Officers Kedrick Doezema or Ryan Wilcox to testify about Mr. Stipanuk's testimony. The decision to not call the officers to the stand was a legally strategic move. [Petitioner] has failed to show the video footage would favor his cause by either impeaching Mr. Stipanuk or offering exculpatory evidence, nor has he shown that it was material insomuch as it would have rendered a different result[.]

*Brown*, 2021 WL 10564394, at *12.

Again, Petitioner offers nothing to suggest that presentation of this video to the jury would have altered the outcome of his trial in any way. As noted above, Petitioner's counsel cross-examined Stipanuk regarding his drug usage and how he was under the influence of crack cocaine on the day of the incident. Petitioner fails to plausibly suggest that the jury would have chosen not to believe Stipanuk and the other prosecution witnesses had the in-car video been used to impeach Stipanuk. Because Petitioner has failed to demonstrate that the trial court's rejection of this claim is contrary to, or an unreasonable application of, *Brady*, Petitioner is not entitled to relief with respect to ground XV.

## J.    Ground XVII—Mistrial Issue

In his Rule 6.502 motion, Petitioner averred that the trial court erred by not *sua sponte* declaring a mistrial when the prosecutor "intentionally elicited knowingly false testimony and offered suppressed evidence and further when it failed to immediately issue a curative instruction allowing the jury to retain knowledge of suppressed evidence." (ECF No. 10-14, PageID.1511.) Specifically, Petitioner contends that the prosecutor asked Detective Gill about how he knew to

send an officer to the victim's apartment, and Detective Gill responded that Petitioner had given

the address to him during an interview. (*Id.*, PageID.1512.) Petitioner argues that line of

questioning violated a prior trial court order stating that the detective could only respond by saying

"during the course of the investigation" with respect to how officers discovered the address. (*Id.*)

Nevertheless, the prosecutor then asked if Petitioner told the detective where the body was located,

and the detective responded, "Yes." (*Id.*) Counsel did not object, and Petitioner contends that the

trial court should have immediately either issued a curative instruction or declared a mistrial. (*Id.*)

> The trial court granted Petitioner relief with respect to this issue, stating:

> Defense counsel objected at trial when the prosecutor was about to encroach into suppressed evidence on direct examination of Detective Gill. A brief sidebar was held and the parties agreed to avoid the use of suppressed statements that [Petitioner] made. Instead, the parries [sic] agreed to have the detective testify the location of the victim's body was obtained through independent investigation by police and not from [Petitioner's] statements. When direct examination resumed, the prosecutor immediately asked about the location of the victim's body and the detective testified it was [Petitioner] that had given police that information.

> Trial counsel mentioned a mistrial might be necessary and this Court agreed it would be a possible option, but defense counsel ultimately advised [Petitioner] that a curative measure would overcome the error. Corrective actions were not taken until after the lunch recess, after more than two hours passed and the jury had time to reflect on the testimony stemming from suppressed information. The prosecutor asked the detective to testify to the contrary of what was said before the recess, that it was not [Petitioner] who revealed the whereabouts of the body, but discovered independently through police investigation. While the reason given for this adjustment was to avoid drawing attention, it was an attempt to retract an incriminating statement but only further highlighted the incriminating information. Because the previous error remained part of the record and was not stricken, the jury was able to consider both the erroneous and permissible parts of the testimony during deliberation when they should have not been exposed to the suppressed information at all. The curative measure did not address the error as would a new trial free from inadmissible statements. A mistrial should have been pursued by defense counsel and this argument has merit.

*Brown*, 2021 WL 10564394, at *14. On appeal, however, the court of appeals reversed the trial

court's decision, stating:

[Petitioner] also argued appellate counsel was ineffective for failing to raise potential mistrial issues in the earlier appeal. His motion for relief from judgment was based, in part, on the investigating detective's testimony, which included facts that had been suppressed by the trial court. Although the detective was able to correct his testimony, [Petitioner] argued that was not enough, and a mistrial should have been declared, or in the alternative, an adequate curative instruction should have been given.

Again, when considering motions for relief from judgment, courts should generally reject claims that either were, or could have been, raised in an earlier proceeding. MCR 6.508(D)(3). However, courts may deviate from this standard for good cause, MCR 6.508(D)(3)(a), and a defendant can demonstrate good cause if he can show that appellate counsel was ineffective. *Reed*, 449 Mich. at 378. In this case, [Petitioner] claimed his appellate counsel was ineffective for failing to challenge the mistrial issue. To succeed, [Petitioner] must demonstrate his appellate counsel was ineffective.

None of [Petitioner's] arguments in connection with his motion for relief from judgment—his original motion, his supplemental brief in support of the motion, and his statements at oral argument—offered any explanation of the "objective standard of reasonableness" necessary to determining whether counsel was effective. Likewise, he failed to analyze appellate counsel's performance under this objective standard. In the absence of such explanation, a defendant's motion for relief from judgment must fail. MCR 6.508(D).

Even so, the trial court in this case provided extensive discussion explaining *its* belief that [Petitioner] was deprived of effective assistance of appellate counsel regarding this issue. But, the burden of proof was not on the trial court, it was on [Petitioner]. Thus, it was an abuse of discretion for the trial court to grant the motion for relief from judgment without adequate argument by [Petitioner].

*Brown*, 2023 WL 2051898, at *6–7. As his seventeenth ground for relief, Petitioner now suggests that the court of appeals did not "make any definitive or specific ruling on this issue," and that the "trial court's ruling on the mistrial is the last state court ruling on this matter." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.524.)

With respect to Petitioner's challenge to the court of appeals' determination that a mistrial was not warranted, the decision to grant or deny a mistrial is, generally, a matter under state law, and a challenge to such a decision is not cognizable on federal habeas review. *See, e.g.*, *Barry v. Warren*, No. 19-1855, 2019 WL 7834652, at *3 (6th Cir. Dec. 11, 2019); *Hruby v. Wilson*, 494 F.

App'x 514, 516 (6th Cir. 2012). That decision, however, may impact federal constitutional rights. *Arizona v. Washington*, 434 U.S. 497, 514 (1978) ("[A] constitutionally protected interest is inevitably affected by any mistrial decision."). For example, if a mistrial is requested because of perceived unfairness caused by the admission of evidence or improper argument, and the request is denied, the underlying impropriety might result in the denial of due process. Thus, federal habeas courts "have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion'" when considering a request to declare a mistrial. *Washington*, 434 U.S. at 514. Filtered through the doubly deferential standard of the AEDPA, "[t]he question . . . is . . . whether the determination of the [state courts] . . . was 'an unreasonable application of . . . clearly established Federal law.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Here, contrary to Petitioner's argument, the court of appeals did make a definitive ruling on the issue of Petitioner's argument regarding counsel's failure to pursue a mistrial, concluding that appellate counsel was not ineffective for failing to argue that trial counsel was ineffective for failing to request a mistrial. As set forth above, and upon this Court's review of the record, the court of appeals correctly noted that the trial court had based its decision regarding a mistrial on its own speculations and beliefs, not upon the arguments raised by Petitioner in his Rule 6.500 motion.

In any event, Petitioner is not entitled to relief with respect to this ground. Petitioner believes that trial counsel should have requested a mistrial on the basis that Petitioner's suppressed statement was admitted during Detective Gill's testimony. When evidence is admitted at trial in violation of the Fifth Amendment, the admission "constitutes a constitutional error that is subject to . . . harmless error analysis." *Cooper v. Chapman*, 970 F.3d 720, 729 (2020) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310–11 (1991)). Recently, the Supreme Court considered the test

federal habeas courts must apply when considering a constitutional error that the state courts have already determined did not prejudice the defendant. *See generally Brown v. Davenport*, 596 U.S. 118 (2022). In *Brown*, the Court held that "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)] and the one Congress prescribed in AEDPA." *Id.* Thus, in short, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents [i.e., *Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 134.

*Brecht* requires that Petitioner show that the error in question had a "substantial and injurious effect or influence" on the outcome of his trial. *See Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Court set forth that a "substantial or injurious effect or influence" equals a determination that petitioners are not entitled to habeas relief "based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Thus, relief is proper only if the reviewing court has "grave doubt" about the effect of the error. *Davis v. Ayala*, 576 U.S. 257, 268 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 U.S. at 637. Essentially, *Brecht* provides that the "State "not be put to th[e] arduous task [of retrial] based on mere speculation that the defendant was prejudiced by trial error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam).

Here, the court of appeals did not engage in a harmless error determination. Nevertheless, as discussed below, Petitioner fails to demonstrate that the error caused by the admission of the suppressed statement had a "substantial and injurious effect or influence" on the jury verdict, as required by *Brecht*. 507 U.S. at 637.

Upon review of the record, the Court concludes that even if Petitioner's suppressed statement regarding the whereabouts of the victim's body had not been admitted into evidence, the prosecution offered overwhelming evidence of Petitioner's guilt for the jury to find Petitioner guilty of first-degree murder. As thoroughly discussed above, Stipanuk and Cervantes, both of whom testified for the prosecution, provided a plethora of inculpatory evidence against Petitioner, including the fact that Petitioner had admitted to both of them that he had committed murder. In light of that testimony, this Court does not have "grave doubt" about the effect of the Fifth Amendment error on the outcome of Petitioner's trial, *Davis*, 576 U.S. at 268, as Petitioner simply has not demonstrated that actual prejudice resulted from the admission of Petitioner's suppressed statement regarding the victim's address. *See Brecht*, 507 U.S. at 637 (quoting *Lane*, 474 U.S. at 449). Instead, Petitioner's arguments amount to nothing but "mere speculation" that he was prejudiced. *See Calderon*, 525 U.S. at 146. Accordingly, because Petitioner has not demonstrated that the Fifth Amendment error had a "substantial and injurious effect or influence" on the outcome of his trial, *id.*, he is not entitled to relief with respect to habeas ground XVII.[4]

### K.    Ground XIX—Spoliation Issue

In ground XIX, Petitioner avers that the Michigan Court of Appeals' rejection of the trial court's ruling that the State committed spoliation of evidence by intentionally disposing of the crime scene within 56 hours of Petitioner's arrest "was in conflict with clearly established federal

---

[4] The *Brown* opinion makes clear that the *Brecht* test and the AEDPA test are distinct and independent. *Brown*, 596 U.S. at 135 (stating that the standards "pose courts with different questions to resolve and require courts to answer those questions based on different legal materials.") Nonetheless, in this instance, the Court's determination that any error was harmless under *Brecht* also effectively means that relief is barred under the AEDPA. Even considering possible differences in the meaning of the term "prejudice" under the two standards, this Court would not conclude that "*every* fairminded jurist would agree that an error was prejudicial," *id.*, where the Court has already concluded that any error was not prejudicial. Accordingly, Petitioner's claim would fail under the AEDPA test as well.

law and was an unreasonable application of the facts of the case." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.530–531.) Petitioner avers that the victim's body was discovered at 10:00 p.m. on April 19, 210, and that the crime scene was released to the family around noon on April 22, 2010. (*Id.*, PageID.531.) Petitioner was not arraigned until 4:45 p.m. on April 22, 2010. (*Id.*, PageID.532.) Petitioner avers that there was no "conceivable reason" for the crime scene to be released before his arraignment, before the appointment of counsel, and before "the CSI team could return" to follow up on gathering evidence during daylight hours. (*Id.*)

Petitioner goes on to assert that the crime scene "had a litany of items listed in the warrant as material that would have included strong potential evidence" that was favorable to Petitioner. (*Id.*) According to Petitioner, these items included journals, personal electronics, finger and palm prints, footwear impressions, and fibers. (*Id.*, PageID.533.) Petitioner mentions that the carpets were cleaned with chemicals about one to three hours "before the time of death was estimated," and that it is likely that these chemicals "if walked on by the perpetrators of this crime would have undoubtedly left imprints on the kitchen linoleum floor." (*Id.*, PageID.534.) Petitioner also notes that the CSI team "testified they needed to look for more fingerprints, as they only did doorknobs." (*Id.*) Petitioner argues that "[w]ithout having a crystal ball, no one will ever be able to estimate how much evidence was spoliated, exculpatory evidence." (*Id.*)

Due process requires that police and prosecutors preserve clearly exculpatory evidence in their possession that might not be available to a defendant through other means. *California v. Trombetta*, 467 U.S. 479, 489 (1984). If such evidence is destroyed, a due process violation occurs irrespective of the good or bad faith of the police. To prevail on such a claim, a defendant must show that the police destroyed evidence with "an exculpatory value that was apparent before it was destroyed." *Id.*

Conversely, when police fail to preserve "potentially useful" evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith to establish a due process violation. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In such a scenario, a defendant must show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

"A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence." *Malcum v. Burt*, 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003). Bad faith cannot be established solely by the mere fact that police had control over the evidence and failed to preserve it, nor will bad faith be established in a situation involving a negligence, or even grossly negligent, failure to preserve such evidence. *Id.*; *see also United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56.

In its opinion and order regarding Petitioner's Rule 6.502 motion, the trial court granted relief on this issue, stating:

> In 2017, the Ingham County Sheriffs [sic] department admitted to a "colossal failure in handling of evidence" that spanned ten years.[] An internal audit was conducted, resulting in the dismissal of over 70 cases. However, only open cases were examined and not closed cases with convictions. This Court made a request for the closed cases to be revisited in 2015 and was told by the Office of the Prosecutor that the Court had no jurisdiction to make such an inquiry. The same request was made to the Attorney [sic] General and State Bar with no response. A number of closed cases from that period, in addition to this one, need to be reviewed for prejudice and possible *Brady* violations.

> The extent of the destroyed or missing evidence in all of the cases will never be fully realized. What remains unknown is if there was a spoliation of apparent exculpatory evidence. This does not mean a careful review is not warranted. This court is concerned about the rights of this [Petitioner] and the rights of all the other defendants. There is a significant possibility that relevant evidence has been lost or destroyed. [Petitioner] had no opportunity to examine potential exculpatory or inculpatory evidence. There was no opportunity to explore, advocate or make any record whatsoever as to the destroyed or missing evidence because of the failure to disclose even the existence of the problems, that were clearly known by the Sheriff and withheld by the People. [Petitioner] was denied the ability to develop complete defenses that emanated from lost or destroyed evidence. The decision to withhold this knowledge was willful on the part of the Ingham County Sheriffs [sic] Office and the Prosecutor's Office. They knew about the spoliation problem and failed to disclose to [Petitioner] and this Court[.] Doing so was in bad faith and beyond mere negligence. It would be a grave injustice if convictions were obtained on cases missing material evidence.
>
> This Court asked the Ingham County Prosecutor, Attorney General, and the State Bar, to examine all closed cases from the time period with spoliation for prejudice. The Prosecutor's Office refused, stating this Court lacked jurisdiction; there was no response from the other two offices. While most closed cases from the affected period of time have yet to be appealed on the spoliation problem, the matter has come to fruition in this case. Spoliation of evidence likely affects this case and would be a violation of the state and federal constitutions. Previously undisclosed evidence for this case may exist if a new trial is pursued. Apparent exculpatory evidence lost to spoliation by the Sheriffs [sic] Office has yet to be confirmed and therefore a violation of due process is not established. Pursuant to the court rules, this Court may still take measures to determine if there was relevant evidence withheld or lost through a hearing. This argument has merit.

*Brown*, 2021 WL 10564394, at *12–13 (footnote omitted). However, on appeal, the Michigan

Court of Appeals concluded that the trial court had erred in granting relief, stating:

> The prosecution first challenges the trial court's conclusion that [Petitioner] was entitled to relief because law enforcement mishandled evidence. In his motion for relief from judgment, [Petitioner] argued that, during the initial investigation, law enforcement prematurely released the scene of the murder to the victim's family. According to [Petitioner], this was an effort by law enforcement to intentionally destroy potentially exculpatory evidence. The trial court concluded that this argument had merit due to a "colossal failure in handling evidence" by the Ingham County Sheriff's Office. It noted that over the course of ten years, the Sheriff's Office had been accused of destroying or mishandling evidence. However, [Petitioner] did not raise this argument, and made no claims against the Sheriff's Office. [Petitioner's] allegations about spoliation related to actions by the *Lansing Police Department* because that is the agency that investigated this case. The trial court erroneously attributed to the Lansing Police Department unrelated allegations

against the Sheriff's Office. Thus, the trial court's findings as to this issue are
clearly erroneous, and the trial court abused its discretion in granting the motion for
relief from judgment on the basis of inaccurate facts that were also not argued by
[Petitioner].

*Brown*, 2023 WL 2051898, at *4.

Petitioner contends that the court of appeals' reversal of the grant of relief on this basis was
because the trial court "simply made a clerical mistake," substituting the Ingham County Sheriff's
Office for the Lansing Police Department. (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.531.)
He argues that the trial court "was aware that the LPD was the controlling agency as three or four
of its officers and detectives testified" at trial. (*Id.*) Petitioner avers that the trial court "seemed to
rant about its distrust and judicial battle from the bench" against the Ingham County Sheriff's
Department. (*Id.*) Petitioner, however, fails to point to where in the record he believe the trial court
made such a "rant," and the Court has not located anything that could be construed as a "rant" by
the trial court against the Sheriff's Department.

Petitioner presents no evidence to suggest that the trial court's reference to the Sheriff's
Department was simply a typographical error. Even if it were, Petitioner presents no evidence from
which this Court could conclude that the court of appeals' rejection of Petitioner's spoliation
argument is contrary to, or an unreasonable application of, clearly established federal law. The
trial court's grant of relief on this issue was based on the trial court's speculation that spoliation
could have occurred because of the admissions made by the Ingham County Sheriff's Department.
Here, Petitioner has latched onto the trial court's speculation to support his spoliation argument.
Petitioner, however, presents no evidence to suggest that the prosecution and law enforcement
officers who investigated the crime scene and released it to the victim's family acted in bad faith.
Moreover, Petitioner fails to show that any of the suggested evidence that was not collected was
material. Petitioner's conclusory allegations and speculative beliefs are insufficient to justify

federal habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (noting that conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335–36 (6th Cir. 2012) (citing *Workman* and affirming the denial of habeas relief for conclusory claims). Accordingly, Petitioner is not entitled to relief with respect to habeas ground XIX.

### L.    Ground XXI—Actual Innocence

As his twenty-first ground for relief, Petitioner contends that the Michigan Court of Appeals' rejection of his "actual innocence claim is based on an unreasonable and faulty application of the facts of the case and wrongly analyzes the trial court's rationale." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.540.) According to Petitioner, "when the forensic examination of Dr. Wendt is properly examined and ruled to be dispositive of the fourth interrogation being suppressed as [Petitioner] and a finding that at the time of *Miranda* was not capable of knowingly and intelligently waiving his rights," there is no evidence left from which the jury could convict Petitioner. (*Id.*)

To the extent Petitioner is attempting to assert a claim of actual innocence premised upon newly discovered evidence, he fails to state a cognizable federal claim. The Supreme Court has stated: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). But the *Herrera* Court did not close the door completely, stating in dicta that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be

warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. Recently, the Sixth Circuit acknowledged that the actual innocence "equitable-exception [to the AEDPA statute of limitations] doctrine is not a freestanding substantive claim for habeas relief. The Supreme Court has not decided whether actual innocence is a substantive ground for relief." *Hubbard v. Rewerts*, 98 F.4th 736, 742 (6th Cir. 2024); *see also Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera* for the proposition that freestanding claims of actual innocence are not cognizable on habeas corpus review); *Cress*, 484 F.3d at 854 (citing cases for the same proposition). Accordingly, in the absence of clearly established Supreme Court precedent establishing a freestanding claim of actual innocence, Petitioner's claim is without merit. Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and, thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Accordingly, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground XXI.

### M.     Ground XXII—Ineffective Assistance of Post-Conviction Counsel

Next, Petitioner contends that the attorney who was appointed to represent him for purposes of Rule 6.502 proceedings was ineffective for failing "to brief Dr. [Wendt's] forensic examination report as newly discovered evidence in his supplemental filings to the trial court." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.542.) However, because there is "no constitutional right to an attorney in state post-conviction proceedings," Petitioner "cannot claim constitutionally

ineffective assistance of counsel in such proceedings." *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991). For that reason alone, Petitioner is not entitled to relief with respect to habeas ground XXII.

### N.    Ground XXIII—Scope of Post-Conviction Appeal

As his twenty-third and final ground for relief, Petitioner contends that the Michigan Court of Appeals erred when it "exceeded the scope of [its] order granting leave to the People, which limited the appeal to issues raised in the application and supplemental brief, when [it] sua sponte made a determination regarding Dr. Wendt's report not being newly discovered." (Br. Supp. Am. § 2254 Pet., ECF No. 7, PageID.543.) Petitioner suggests that he was denied a "fair appellate process" because this issue was "not briefed or argued by either side." (*Id.*)

"[T]he Supreme Court has held that states have no constitutional obligation to provide post-conviction remedies." *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)). Therefore, "habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief." *Id.* (citing *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (noting that "errors in post-conviction proceedings are outside the scope of federal habeas corpus review"). Here, Petitioner essentially avers that the Michigan Court of Appeals procedurally erred during post-conviction proceedings by not providing the parties an opportunity to brief the issue of whether Dr. Wendt's report constitutes newly discovered evidence. However, "[w]hether or not the Michigan [Court of Appeals] complied with the procedural requirements of Michigan law is not a matter for this [C]ourt to decide on a petition for habeas corpus relief." *Hayes v. Prelesnik*, 193 F. App'x 577, 584 (6th Cir. 2006). Accordingly, Petitioner is not entitled to relief with respect to habeas ground XXIII.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined Petitioner's claim under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claim. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claim was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

**<u>Conclusion</u>**

The Court will enter an order denying a certificate of appealability, and a judgment denying

Petitioner's amended § 2254 petition for failure to assert a meritorious federal claim.


Dated: <u>November 18, 2025</u>                    <u>/s/ Hala Y. Jarbou</u>
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE